JENNER & BLOCK LLP
TODD C. TORAL (SBN 197706)
ttoral@jenner.com
633 West 5th Street
Los Angeles, CA  90071-2054
Telephone:   (213) 239-5100
Facsimile:   (213) 239-5199

BRIAN J. FISCHER (*pro hac vice*)
bfischer@jenner.com
RÉMI J.D. JAFFRÉ (*pro hac vice*)
rjaffre@jenner.com
919 Third Avenue
New York, NY  10022-3908
Telephone:   (212) 891-1600
Facsimile:   (212) 891-1699

Attorneys for Empros Capital LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| Empros Capital LLC, a California Limited Liability Company,<br><br>                              Plaintiff,<br><br>        v.<br><br>Gary Rosenbach, an individual,<br><br>                              Defendant. | Case No.: 3:20-cv-6788-WHO<br><br>**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: November 10, 2020 at 2:00 PM (via Videoconference)<br><br>Judge: Hon. William H. Orrick |

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ..............................................................................................................1

II.    ARGUMENT ....................................................................................................................2

    A.    Empros Is Likely to Succeed on the Merits of Its Claim That Rosenbach Should Be Enjoined from Arbitrating His Claim Against Empros. ...................................2

        1.    Under Established Precedent, the Absence of Required Signatures on the Draft Documents Is Dispositive. ..................................................................2

        2.    The Court Cannot Infer an Arbitration Agreement from the Other Facts on Which Rosenbach Relies. .......................................................................8

    B.    Empros Will Suffer Irreparable Injury if Forced to Arbitrate............................13

    C.    The Balance of Equities and Public Interest Weigh in Favor of an Injunction. ................14

III.   CONCLUSION................................................................................................................15

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Alatortev v. JetBlue Airways Corp.*,
    795 F. App'x 503 (9th Cir. 2019) ........................................................................................11

*Angell v. Rowlands*,
    149 Cal. Rptr. 574 (Ct. App. 1978)........................................................................................6

*Atlantique Productions, S.A. v. Ion Media Networks, Inc.*,
    No. 12-CV-8632-DMG, 2014 WL 11820243 (C.D. Cal. Jan. 31, 2014) ...........................10

*Banner Entertainment, Inc. v. Superior Court*,
    72 Cal. Rptr. 2d 598 (Ct. App. 1998) ...........................................................................3, 4, 6

*Brighton Investment, Ltd. v Har-Zvi*,
    932 N.Y.S.2d 214 (App. Div. 2011) .......................................................................................7

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
    222 Cal. App. 3d. 1371 (Ct. App. 1990)................................................................................8

*Cleveland v. Compass Vision, Inc.*,
    No. C07-5642-BZ, 2008 WL 576755 (N.D. Cal. Feb. 29, 2008) .........................................5

*Comer v. Micor, Inc.*,
    436 F.3d 1098 (9th Cir. 2006) .............................................................................................15

*Drabek v. AAI Corp.*,
    No. B164233, 2004 WL 1904130 (Cal. Ct. App. Aug. 26, 2004)......................................5, 6

*Fleetwood Enters., Inc. v. Gaskamp*,
    280 F.3d 1069 (5th Cir. 2002) .............................................................................................14

*Genesco, Inc. v. T. Kakiuchi & Co.*,
    815 F.2d 840 (2d Cir. 1987)...................................................................................................4

*Gray1 CPB, LLC v. Kolokotronis*,
    135 Cal. Rptr. 3d 448 (Ct. App. 2011) ............................................................................10, 11

*Jafari v. F.D.I.C.*,
    No. 12-CV-2982-LAB (RBB), 2015 WL 3604443 (S.D. Cal. June 8, 2015)......................5

*Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*,
    950 N.Y.S.2d 8 (App. Div. 2012)..........................................................................................7

*Med. Dev. Corp. v. Indus. Molding Corp.*,
    479 F.2d 345 (10th Cir. 1973) ...............................................................................................4

*People ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*,
111 Cal. Rptr. 197 (Ct. App. 1973)................................................................................11

*PSM Holding Corp. v. Nat'l Farm Fin. Corp.*,
339 F. App'x 693 (9th Cir. 2009)..................................................................................5

*Pry Corp. of America v. Leach*,
2 Cal. Rptr. 425 (Ct. App. 1960)...................................................................................8

*Recycle for Change v. City of Oakland*,
No. 15-CV-5093-WHO, 2016 WL 344751 (N.D. Cal. Jan. 28, 2016).........................14

*Robinson v. Chefs' Warehouse, Inc.*,
No. 15-CV-5421-RS, 2020 WL 1548397 (N.D. Cal. Feb. 6, 2020)............................5

*Spinney v. Downing*,
41 P. 797 (Cal. 1895)....................................................................................................3

*Tzu Chien Chen v. Thomas & Betts Corp.*,
268 F. App'x 508 (9th Cir. 2008)..................................................................................8

*Valero Refining, Inc. v. M/T Lauberhorn*,
813 F.2d 60 (5th Cir. 1987)..........................................................................................4

*Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*,
192 Cal. Rptr. 3d 838 (Ct. App. 2015) ....................................................................6, 13

*Ward v. Goossen*,
71 F. Supp. 3d 1010 (N.D. Cal. 2014) ....................................................................10, 11

*Yelp Inc. v. Catron*,
No. 13-CV-02859-KAW, 2014 WL 12776735 (N.D. Cal. Sept. 8, 2014) ..................8

*Youngevity Int'l v. Smith*,
No. 16-CV-704-BTM-JLB, 2019 WL 1369008 (S.D. Cal. Mar. 26, 2019) .............6, 7

*Yujin Robot Co. v. Synet Electronics Inc.*,
No. 14-CV-6237-SJO, 2015 WL 12762254 (C.D. Cal. Dec. 22, 2015).......................5

**Statutes**

Cal. Civ. Code § 1641...........................................................................................................11

**Court Rules**

9th Cir. R. 36-3 ......................................................................................................................5

Fed. R. App. P. 32.1...............................................................................................................5

Fed. R. Civ. P. 65 ..................................................................................................................1

Civ. Local R. 3-4 .................................................................................................................5

Civ. Local R. 65-2 ...............................................................................................................1

**Other Authorities**

AAA Com. Arb. R. R-7 ......................................................................................................14

EMPROS'S REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 3:20-cv-6788-WHO

Empros[1] submits this Reply Memorandum of Points and Authorities in further support of its *Ex Parte* Motion under Federal Rule of Civil Procedure 65 and Civil Local Rule 65-2 requesting that the Court issue a preliminary injunction staying the arbitration brought by Rosenbach.[2]

## I.   **INTRODUCTION**

Rosenbach's opposition to Empros's Motion kills any suspense: no evidence exists that Empros, the Fund, or its Manager signed any of the Draft Documents, as required for those documents to become effective agreements and for the arbitration clauses in them to bind anyone.  Operative case law straightforwardly holds that the absence of a signature is dispositive where, as here, the Draft Documents state expressly and repeatedly that they will not become binding unless signed by everyone.  Not only did Empros, the Fund, and the Manager refuse to sign the Draft Documents, Empros told Rosenbach within days of learning his identity that it was rejecting his investment, as was its unqualified pre-execution right under the Draft Documents.

Rosenbach, a highly sophisticated investor hedge fund founder with decades of experience in the industry,[3] all but ignores these key provisions of the Draft Documents he seeks to enforce, and fails to explain how a document could give rise to a binding arbitration agreement absent the signatures required by that same document's express terms.  Instead, Rosenbach offers a series of extraneous, legally irrelevant facts from which he argues the Court can cobble together an agreement to arbitrate and a broader contract for the sale of securities.  But established California law bars inferring such an agreement where the documents sought to be enforced as contracts lack the signatures that those very documents unambiguously

---

[1] Capitalized terms and abbreviations have the same meaning as in Empros's opening Memorandum of Points and Authorities in Support of *Ex Parte* Motion for Temporary Restraining Order and Order to Show Cause Re Preliminary Injunction (Dkt. 10-2).  "Mem." refers to that opening Memorandum.  "Opp'n" refers to Rosenbach's Memorandum of Points and Authorities in Opposition to Motion for Preliminary Injunction (Dkt. 27).

[2] The Court's Order of October 2, 2020 (Dkt. 19) mooted the portion of the Motion seeking a temporary restraining order.

[3] Rosenbach does not dispute this characterization of his level of experience and sophistication—nor could he.  Indeed, Rosenbach has not supplied any testimony in conjunction with his opposition at all, whereas Empros's Complaint was verified by its founder Alex Fishman and is thus the equivalent of sworn testimony.  Rosenbach's failure to come forward with testimony is not surprising, because the facts of what transpired between the parties are clear and undisputable, and those facts compel the conclusion that there is no binding arbitration agreement between the parties.

require to render the documents enforceable.  Indeed, Rosenbach does not cite a single case stating that a binding agreement can be inferred under these circumstances—because there is none.

Simply put, the Draft Documents that contain arbitration clauses expressly require execution by the Manager, Empros, and the Fund to become binding, and that never happened here.  Accordingly, there is no agreement to arbitrate.  That conclusion is consistent with and compelled by existing law, the text of the Draft Documents, and the reasonable expectations of the parties in the course of their limited dealings with each other.

As to irreparable harm, what is missing from Rosenbach's submission is any commitment to keep the arbitration in abeyance until this Court makes a final determination on the issue of arbitrability, much less until this litigation concludes.  If the Court denies Empros's Motion, there is nothing preventing Rosenbach from immediately reviving the arbitration and forcing Empros to defend itself in a forum to which it never assented.  Under established precedent, that constitutes irreparable harm and warrants preliminary injunctive relief.  Finally, in light of the absence of any arbitration agreement, the balance of equities and the public interest both weigh in favor of an injunction.

## II.   ARGUMENT

**A.   Empros Is Likely to Succeed on the Merits of Its Claim That Rosenbach Should Be Enjoined from Arbitrating His Claim Against Empros.**

**1.   Under Established Precedent, the Absence of Required Signatures on the Draft Documents Is Dispositive.**

The Draft Documents containing the arbitration provisions on which Rosenbach relies were never signed by Empros, the Fund, or its Manager.  *See* V.C. ¶¶ 26–27, 30–31, 34–35 & Exs. D, H, L at 35–36, E, I, M at 16.  Consequently, an executed acceptance of Rosenbach's investment was never delivered to him.  Rosenbach does not contend otherwise.  Nor does Rosenbach dispute that the Draft Documents by their plain terms explicitly require those signatures and that delivery to become effective.  *See* Mem. 5,

Table 1.[4]  Under established precedent, these uncontested facts settle the issue in Empros's favor: the lack of the required signatures means the Draft Documents, and the arbitration clauses they contain, never became binding.

Where a document expressly states that it will not become a binding agreement absent execution by specified parties, the lack of the requisite signatures is dispositive on the issue of contract formation. That is, there is no contract.  California law has been set on this point since at least *Spinney v. Downing*, 41 P. 797 (Cal. 1895), where the California Supreme Court ruled that a proposed contract never became binding because one party did not sign it and the parties understood the contract was to be signed by both parties.  *Id.* at 798.  As explained more recently in *Banner Entertainment, Inc. v. Superior Court*, 72 Cal. Rptr. 2d 598 (Ct. App. 1998), "[w]hen it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created."  *Id.* at 603; *see also* Mem. 12–13.

Rosenbach concedes that *Banner Entertainment* sets forth the governing standard, Opp'n 14, but he misreads that case.  The language quoted above states that the parties' intent not to be bound absent full execution can be determined *either* from the express terms of the draft agreement or from "other evidence presented by the parties" (or both).  It does not state, as Rosenbach appears to suggest, that such "other evidence" is necessary to establish the parties' intent when the draft agreements at issue are unambiguous on the issue, as the Draft Documents are here.

In any event, there is ample "other evidence" of the parties' intent to be bound only by fully executed deal documents, and none of the "other evidence" Rosenbach relies on suggests that the required-execution provisions of the Draft Documents can be disregarded wholesale.  For example, the June 10

---

[4] For example, the opening sentence of the Subscription Agreement provides that "This Subscription Agreement is . . . effective as of the date set forth ***above the Manager's signature on the Acceptance of Subscription page of this Agreement***," and section 1(c) provides that "This Subscription shall be deemed to be accepted by the Manager and this Agreement shall be binding against the Manager ***only upon execution and delivery to the Subscriber of the Acceptance of Subscription attached hereto***."  Mem. 5, Table 1 (emphases added).

Email's disclaimer states that the email was "not intended to be, nor shall it be construed as . . . an offer, or the solicitation of any offer, to buy or sell any securities," V.C. ¶ 24;[5] the parties' emails contain repeated references to closing documents, V.C. ¶¶ 21, 23; and Rosenbach acknowledged the parties did not have a binding deal as late as Sunday, June 14, evidenced by his email to Fishman (sent to try to salvage the investment) stating that he "look[ed] forward to moving forward on this deal," V.C. ¶ 62.

Rosenbach also attempts to distinguish *Banner Entertainment* on the grounds that the parties there "had previously entered into an oral agreement, which made no mention of arbitration whatsoever." Opp'n 16. But here, too, the parties never discussed arbitration at all, and as in *Banner*, the only mention of arbitration was in draft documents that were never signed and thus by their own terms never became binding.[6] Rosenbach also quotes *Banner* to mistakenly suggest that the presence or absence of signatures on the Draft Documents is not dispositive. *Id.* The quoted language, however, came in the context of the court distinguishing three cases where an agreement to arbitrate could be inferred from the parties' past dealings or from the parties' ratification of an unsigned writing. *See Banner Ent.*, 72 Cal. Rptr. 2d at 605–06. Significantly, in none of those cases did the court consider an unsigned writing containing a provision stating that it would become binding only if signed by all required parties. *See Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 845–46 (2d Cir. 1987); *Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 63–64 (5th Cir. 1987); *Med. Dev. Corp. v. Indus. Molding Corp.*, 479 F.2d 345, 348 (10th Cir. 1973).

Rosenbach's remaining efforts to cast doubt on the governing legal rule and distinguish the cases cited by Empros are unpersuasive because they focus on immaterial factual distinctions while ignoring the

---

[5] Rosenbach's only response to the June 10 Email's disclaimer of any offer is that the disclaimer was not "prominent[ ]" and that "the email was sent by Erica Asinof on behalf of Empros not on behalf of Old City." Opp'n 14 n.15. Rosenbach does not even try to explain why the disclaimer—which was easily accessible through the click of a link and reads as a standard industry reminder that private investments are consummated through formal documentation, not over email—needed to be more "prominent." Nor does he explain the significance of his Old City/Empros distinction, and in any event, as the June 10 Email and its disclaimer make clear, Empros (in particular Alex Fishman) is a "registered representative of Old City Securities LLC." *See* V.C. Ex. B at 3.

[6] Indeed, under Rosenbach's theory, *Banner Entertainment* is even more factually apposite because he claims that the parties' initial email exchanges here, which did not mention arbitration at all, gave rise to a contract. *See* Opp'n 6, 18–19. Rosenbach cannot press this theory and simultaneously seek to distinguish *Banner* on that basis. Empros disputes that any such contract can be inferred, but in any event, that question is irrelevant to whether the parties reached an agreement to arbitrate.

key fact in each of those cases: the draft agreements at issue expressly required certain signatures to become binding.  Rosenbach claims, for example, that *Yujin Robot Co. v. Synet Electronics Inc.*, No. 14-CV-6237-SJO (ASx), 2015 WL 12762254 (C.D. Cal. Dec. 22, 2015), is distinguishable because the agreement there was not signed by *either* party.  *See* Opp'n 15.  But he fails to explain the significance of this distinction.  There, like here, the agreement "expressly include[d] a provision that the agreement would only become effective upon the signing of both parties."  *Yujin Robot*, 2015 WL 12762254, at *10.  And there, as here, it was undisputed that the agreement was not signed by the parties required by the agreement's own terms.  *See id.* at *11.  Thus, the same result should follow here.

Rosenbach similarly misses the forest for the trees in his treatment of *Jafari v. F.D.I.C.*, No. 12-CV-2982-LAB (RBB), 2015 WL 3604443 (S.D. Cal. June 8, 2015).  His argument focuses on peripheral factual distinctions without explaining why they are meaningful, and ignores the key fact underlying the *Jafari* court's decision: the document at issue stated that it "shall not be binding upon, or effective against, any party signing a counterpart unless and until all parties have signed counterparts."  *Id.* at *6.

The *Jafari* court relied on *PSM Holding Corp. v. National Farm Financial Corp.*, 339 F. App'x 693 (9th Cir. 2009), where the Ninth Circuit found a lack of signatures dispositive in light of a similar provision requiring execution by all parties, and noted that extrinsic evidence suggesting one party "may have thought [a counter-party] bound by the terms of the agreement . . . cannot substitute for the parties' signatures on the agreement."  *Id.* at 694 (citing *Spinney*, 41 P. at 789–99).  Rosenbach erroneously claims that Empros's citation of *PSM Holding* violates Civil Local Rule 3-4(e), ignoring Rule 3-4(e)'s cross-reference to Ninth Circuit Court of Appeals Rule 36-3, which provides that unpublished dispositions of the Ninth Circuit issued on or after January 1, 2007, such as *PSM Holding*, "may be cited to the courts of this circuit in accordance with [Federal Rule of Appellate Procedure] 32.1."[7]

Likewise, Rosenbach attempts to make much of the fact that in *Drabek v. AAI Corp.*, No. B164233, 2004 WL 1904130 (Cal. Ct. App. Aug. 26, 2004), the drafter was attempting to enforce the putative

---

[7] *See Cleveland v. Compass Vision, Inc.*, No. C07-5642-BZ, 2008 WL 576755, at *1 (N.D. Cal. Feb. 29, 2008) (finding no violation of Civil Local Rule 3-4(e) where citation to unpublished case complies with Federal Rule of Appellate Procedure 32.1(a) and with the local rules of the issuing court); *see also Robinson v. Chefs' Warehouse, Inc.*, No. 15-CV-5421-RS, 2020 WL 1548397, at *2 (N.D. Cal. Feb. 6, 2020) (noting Civil Local Rule 3-4(e) prohibits citations to certain opinions designated Not for Citation "[t]o the extent not preempted by Rule 32.1 of the Federal Rules of Appellate Procedure").

contract against the non-drafting party.  But the court did not rely on this at all in concluding that no contract had been formed.  *See id.* at *7.  Instead, the basis for the court's decision was again a provision in the draft agreement at issue stating that "the parties' agreement d[id] not take effect until signed by both parties."  *Id.*  As the court explained, without full execution, "[i]t is illogical that [the parties] could have entered into an enforceable contract that, as confirmed by the document admittedly memorializing its terms, required that the agreement be in writing."  *Id.*  Once again, same here.

As significant as Rosenbach's failure to distinguish Empros's cases is his inability to cite a single case supporting his theory that a party may be bound by an unsigned writing *expressly stating* that it will not become binding unless signed by all or specified parties.  The cases on which Rosenbach does rely are simply inapposite.  In *Angell v. Rowlands*, 149 Cal. Rptr. 574 (Ct. App. 1978), the issue was whether a writing signed by some, but not all, of the parties could be enforced against those *that had signed*.  The court concluded that it could, because there was "no evidence which shows the parties intended to be bound only if all parties signed the contract."  *Id.* at 578.  Here, by contrast, the Draft Documents stated expressly that they would not become binding absent execution by all required signatories (*e.g.*, Empros).  Indeed, the *Angell* court recognized that its decision would have been different if the writing at issue had contained an "express condition[] that the contract was not intended to be complete until all parties had signed."  *Id.*

Similarly, in *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 192 Cal. Rptr. 3d 838 (Ct. App. 2015), unlike here, there was no "evidence the parties contemplated acceptance of the Contract would be signified by signing it."  *Id.* at 846 (quotation marks omitted).  Indeed, the *Vita Planning* court distinguished *Banner Entertainment* on that very basis.[8]  *Id.*  And in *Youngevity International v. Smith*, No. 16-CV-704-BTM-JLB, 2019 WL 1369008 (S.D. Cal. Mar. 26, 2019), there also was no provision stating that the non-compete agreement at issue would not become binding absent certain signatures.  The court held that the non-compete was enforceable against the defendant even though it was unsigned, but only because it concluded that the non-compete should be "taken together" with another agreement, which the defendant *had* signed, and because the defendant conducted himself as though he

---

[8] Further, in *Vita Planning*, the plaintiff sued for breach of the very contract that contained the forum selection clause the defendant sought to enforce, and the court held that this constituted a judicial admission that the contract was enforceable.  192 Cal. Rptr. 3d at 845.  As explained in the next section, there has been no such judicial admission by Empros here.

had assented to the non-compete agreement, including by emailing the plaintiff that he would honor that agreement. *See id.* at *3–4. No comparable facts exist here.

The New York cases on which Rosenbach relies do not help him either. As an initial matter, Rosenbach never explains why New York law applies. Setting aside the choice-of-law problem, these cases do not support Rosenbach's novel theory that the Draft Documents' required-execution provisions can be ignored. In *Brighton Investment, Ltd. v Har-Zvi*, 932 N.Y.S.2d 214 (App. Div. 2011), the court affirmed the *denial* of summary judgment to the party seeking to *enforce* the putative contract. *Id.* at 216–17. And unlike the Draft Documents here, the unsigned writing in *Brighton Investment* did not contain a required-execution provision. *Id.* Instead, there was "an ambiguity as to whether the parties intended to be bound by the [writing] before it was formally signed." *Id.*[9] *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 950 N.Y.S.2d 8 (App. Div. 2012), simply stands for the proposition that a contract can in appropriate circumstances be inferred from an exchange of emails, but says nothing about whether an unsigned writing can be enforced notwithstanding express terms requiring execution, an issue not presented in that case. *See id.* at 9–10.

The law could not be clearer. Where a draft agreement states that it will not become binding unless signed by all required parties, as the Draft Documents do here, it cannot be enforced unless all required parties have in fact signed. Rosenbach cites no authority for the opposite proposition. None of the cases he relies on involved an agreement with a required-execution provision, and Rosenbach scarcely acknowledges the existence of such provisions in the Draft Documents. But under the long-established, unambiguous precedent set forth in Empros's opening memorandum, the absence of signatures from the Fund, its Manager, and Empros on the Draft Documents dooms any argument that those documents became binding and any effort to enforce the arbitration clauses they contain.

---

[9] Rosenbach also relies on *Brighton Investment* to argue that even "in the securities context" contracts are sometimes concluded informally. Opp'n 19. But Rosenbach glosses over the fact that in that case, the question was whether the plaintiff investor and defendant broker, who had an *existing* contract, had entered into a new contract whereby the defendant guaranteed the plaintiff a certain return on his investment. *Brighton Inv.*, 932 N.Y.S.2d at 215. Plainly, the modification of an existing agreement between an investor and his established broker raises very different issues from the decision whether to admit a *new* investor with whom no course of dealing exists as a member in a private investment fund.

7

1  **2.      The Court Cannot Infer an Arbitration Agreement from the Other Facts on Which**

2  **Rosenbach Relies.**

3      Rather than confront the express required-execution provisions in the Draft Documents and say

4  forthrightly what he is asking the Court to do with them (ignore them), Rosenbach points the Court to a

5  grab bag of other tangential facts from which he claims an arbitration agreement can be inferred.  But

6  Rosenbach's facts are irrelevant to whether the parties agreed to arbitrate this dispute, and in any event

7  cannot overcome the core deficiency in Rosenbach's theory: the absence of the required signatures on the

8  Draft Documents.

9      Rosenbach at times appears to rely on the parties' initial email exchanges, *see* V.C. Ex. A; Decl. of

10  Katherine M. Sullivan ("Sullivan Decl.") Ex. A (Dkt. No. 27-1), which Rosenbach claims contained "all

11  of the material terms" of the parties' agreement and thus purportedly gave rise to a binding contract.  *See*

12  Opp'n 19.  This claim has multiple problems.  First, even assuming counterfactually that the parties' June

13  9 and June 10 email exchanges established a contract, those initial emails do not discuss arbitration at all.

14  Thus, even if a binding agreement could be inferred from those emails (which it cannot), it would *not* be

15  an agreement to arbitrate.  Those emails are irrelevant to the issue before the Court, which is whether the

16  parties bound themselves to arbitrate this dispute.  Second, again indulging Rosenbach's claim of a

17  contract, Rosenbach failed to fund by the deadline set forth in the emails, leaving him in no position to

18  now cry breach on Empros's part.[10]  Third, numerous unquestionably material terms were not discussed in

19  the emails at all.  For example, the emails do not state the amount of the "carry percentage" of Fund

20  members' gains that is retained by Empros as a fee for sponsoring the Fund.  That would plainly have been

---

21  [10] The June 10 email was clear that funding needed to be initiated by Friday, June 12, and received by

22  Empros by Monday, June 15.  V.C. ¶ 23.   The funding corresponding to Rosenbach's prospective

23  investment through his personal IRA was never received by Empros, on June 12 or June 15 or otherwise.

24  *See* V.C. ¶ 58.  Rosenbach claims the June 10 email characterizes timely funding as "the most important"

pre-contractual step.  Opp'n 17.  Even accepting Rosenbach's view, then, he has no ability to claim breach.

25  *See Tzu Chien Chen v. Thomas & Betts Corp.*, 268 F. App'x 508, 511 (9th Cir. 2008) ("Under applicable

California law, '[a] party complaining of the breach of a contract is not entitled to recover therefor unless

26  he has fulfilled his obligations.'" (quoting *Pry Corp. of America v. Leach*, 2 Cal. Rptr. 425, 429 (Ct. App.

1960))); *Yelp Inc. v. Catron*, No. 13-CV-02859-KAW, 2014 WL 12776735, at *9 (N.D. Cal. Sept. 8, 2014)

27  ("A claim for breach of contract is comprised of a contract, plaintiff's performance or excuse for

nonperformance, defendant's breach, and the resulting damages to plaintiff." (citing *Careau & Co. v. Sec.*

28  *Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d. 1371, 1388 (Ct. App. 1990))), *report and recommendation adopted*, 70 F. Supp. 3d 1082 (N.D. Cal. 2014) (Orrick, J.).

a material financial term of any agreement for Rosenbach to invest in the Fund.  Nor did the emails specify the manner in which the Fund was to be invested in Palantir (*e.g.*, through purchase of physical shares, or interests in a special-purpose vehicle, or through forward contracts?) or the class of underlying Palantir stock (*e.g.*, common or preferred?).  As another example, the parties are now disputing whether this matter should be arbitrated or litigated in court.  That is another material term missing from the parties' sparse initial exchange of emails.  Surely it is not Rosenbach's position that, following the spare June 9 and June 10 email exchanges, Empros was free to plug in whatever terms it wanted to fill these holes, no matter how unfair or imbalanced they might have been.

Because there was no mention of arbitration in the parties' limited correspondence outside the Draft Documents, Rosenbach shifts focus and relies on the Draft Documents to make out his case for arbitration.  But again, those arguments run into the headwinds of the required-execution provisions in the Draft Documents.  Rosenbach asserts, for example, that Empros should be bound by the Draft Documents because Empros drafted them and provided them to Rosenbach as "Execution Copies."  *See* Opp'n 13.  But Empros also carefully drafted the Draft Documents to require the signatures of specified parties before they became binding, and to preserve Empros's discretion to reject investors until that happened.  *See* Mem. 5–6, Table 1; Mem. 6–8, Table 2.  Rosenbach cannot cherry-pick and seek to hold Empros, as drafter, to certain provisions of the Draft Documents while ignoring others Empros included to preclude the very arguments and claims Rosenbach now asserts.[11]

Further, Rosenbach's position would render the Draft Documents enforceable contracts while simultaneously nullifying large swaths of them, including their myriad provisions plainly requiring signatures by the Manager, Empros, and the Fund for the documents to become effective.  This is impermissible under California law, under which "[c]ourts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory,

---

[11] One unacceptable outcome of Rosenbach's patchwork reliance on both the unexecuted Draft Documents and the parties' correspondence in order to claim there is a contract with an arbitration provision is that, if operative, the Draft Documents preclude consideration of that correspondence under their rigid integration clauses.  Mem. 8.  On Rosenbach's view, the parties' correspondence would impermissibly modify fully integrated documents by negating the many execution provisions.  Rosenbach cannot reconcile his use of that correspondence with the integration clauses; indeed, as with so much else important in the Draft Documents, he ignores the integration clauses altogether.

inoperative or meaningless." *Ward v. Goossen*, 71 F. Supp. 3d 1010, 1014 (N.D. Cal. 2014); *see also Gray1 CPB, LLC v. Kolokotronis*, 135 Cal. Rptr. 3d 448, 455–56 (Ct. App. 2011) (rejecting party's argument that "would render meaningless many of the provisions of the written agreement and violate our basic duty to give effect to every part of the contract, considered as a whole").

Rosenbach's arguments that the unsigned Draft Documents should effectively be deemed signed by Empros are similarly foreclosed. Rosenbach claims that Empros's statement in the June 10 Email (Sullivan Decl. Ex. D, which Rosenbach calls the "Welcome Email") that "we are thrilled to have you be part of our fund" constitutes an "email signature," Opp'n 14, and makes much of the fact that the June 10 Email states that the Operating Agreement "will be executed" by Empros and the Manager, Opp'n 7, 14–15. But he provides no authority suggesting that these facts are relevant in any way. Indeed, the court in *Atlantique Productions, S.A. v. Ion Media Networks, Inc.*, No. 12-CV-8632-DMG (PLAx), 2014 WL 11820243 (C.D. Cal. Jan. 31, 2014), rejected precisely these arguments, holding that an unsigned term sheet was unenforceable even though the parties referred to copies of the term sheet as "final execution cop[ies]" and even though the parties exchanged emails with statements such as "I believe we are all good" and "So, we're closed!" *Id.* at *5–7.[12] This Court would be breaking new ground that contradicts settled authority if it concluded that Empros's optimism about a smooth closing, and expressions thereof, should override the plain terms of the Draft Documents transmitted in the same communication.

Further, it beggars belief that an experienced and sophisticated investor like Rosenbach would have considered signing the documents governing a private placement of securities to be a mere "*pro forma* act," as Rosenbach claims, *see* Opp'n 14–15, particularly when such crucial terms as Empros's fees had not previously been discussed by the parties. Tellingly, Rosenbach does not submit a declaration with his opposition to the Motion in which he claims that, in his decades of experience transacting private securities,

---

[12] Rosenbach argues that *Atlantique Productions* is distinguishable because "the party arguing that no contract was formed had directly communicated to its counterparty that their agreement was pending its internal approvals and signature on the term sheet." Opp'n 15. But here, likewise, Empros communicated its intention not to be bound by the *Draft* Documents by including multiple execution provisions in those documents alongside multiple provisions stressing Empros's unfettered right to reject prospective investments, even after funds were sent. *See* Mem. 5-6, Table 1; Mem. 6, Table 2.

he has ever entered into a multi-million dollar investment, as buyer or seller, without the parties executing formal agreements—much less parties that, as here, were total strangers.[13]

Rosenbach also relies on the fact that the Subscription Agreement's arbitration clause covers disputes arising out of "the Fund's offering of the Fund Interest." *See* Opp'n 2, 8, 13, 17. But that language is a legal nullity because the arbitration clause, like the rest of the Subscription Agreement, never became binding for lack of the signatures required by the express terms of that same agreement. Rosenbach's interpretation of the clause as covering disputes about the formation of the contract impermissibly reads out the required-execution provisions that are fatal to Rosenbach's position. *See Ward*, 71 F. Supp. 3d at 1014; *Gray1*, 135 Cal. Rptr. 3d at 455–56. The correct reading of the clause, which is consistent with the balance of the Draft Documents, is that it applies to and makes arbitrable securities fraud and similar claims brought by *existing* investors, *i.e.*, a claim that in the offering of a *consummated* investment, Empros made a material misrepresentation or omission of fact. *See Alatortev v. JetBlue Airways Corp.*, 795 F. App'x 503, 504 (9th Cir. 2019) ("Further, the 'cardinal rule of construction [is] that a contract is to be construed as a whole, effecting harmony among and giving meaning to all the parts thereof . . . .'" (quoting *People ex rel. Dep't of Parks & Recreation v. West-A-Rama, Inc.*, 111 Cal. Rptr. 197, 201 (Ct. App. 1973))); *see also* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.").

Rosenbach's remaining arguments stray even further from the central issue whether the parties agreed to arbitrate this dispute.

First, Rosenbach mischaracterizes and overstates the significance of a form Empros executed at Rosenbach's request to facilitate the transfer of funds for the portion of his investment that would have been nominally held by his IRA (which funding never arrived). *See* Opp'n 3, 8, 15; Sullivan Decl. Ex. B.

---

[13] This is not the only instance in which the lack of submitted testimony from Rosenbach is striking. Rosenbach claims that his funds were not returned promptly after his investment was rejected, *see* Opp'n 10 n.11, but provides no support for this assertion apart from non-evidentiary attorney argument masquerading as fact. The lack of evidentiary support is unsurprising because the date stamps on the bank records plainly show that Empros's bank processed the returns on "6/16/2020"—the day after Empros informed Rosenbach that his investment was being rejected. *See* V.C. Ex. T at 8–10. This conclusively rebuts Rosenbach's unsupported innuendo that Empros may have retracted its express requests, reflected in the banking records included in Exhibit T, for the Bank to return the funds promptly.

Nowhere does this form state that Rosenbach had already been accepted as a member in the Fund or that Rosenbach "had a new investment with Empros," as Rosenbach claims. *See* Opp'n 15. Indeed, if Rosenbach's investment had already been accepted and completed, the form would not have been necessary. And even more to the point, the form says nothing about any agreement to arbitrate. Nor is there any provision of the Draft Documents that says the completed form is an acceptable substitute for the required executions of the Draft Documents.

Second, Rosenbach complains that Empros could not have had any valid KYC/AML concerns about Rosenbach because it continued to seek ways to accommodate him after rejecting his investment. Opp'n 10. But Empros's valid reasons for rejecting Rosenbach have no relevance to whether the parties entered into a binding arbitration agreement in the first place. In any event, as explained in Empros's opening memorandum, Empros had full discretion to reject Rosenbach's investment for any reason or no reason at all, not just reasons arising out of KYC/AML diligence. *See* Mem. 6–8, Table 2. Moreover, Empros's efforts to placate Rosenbach do not negate the validity of Empros's reputational concerns about him (which are in fact KYC concerns).[14] Threatened by Rosenbach's stature, influence, and resources, Empros sought alternatives for him to invest in Palantir (*not* through the Fund), and when it became clear that Rosenbach planned to file a claim, Empros made an offer in a last-ditch attempt to defuse the situation or at the very least mitigate its potential damages. Rosenbach should not now be rewarded because his aggressive tactics and explicit threats strong-armed Empros into offering some concessions. Certainly none of those defensive efforts make up for the fact that Empros, the Manager, and the Fund never signed the Draft Documents that Rosenbach is attempting to enforce.

Finally, relying again on *Vita Planning*, Rosenbach claims that Empros "admitted" the Draft Documents were binding by pointing out that Rosenbach violated the confidentiality provisions they

---

[14] Rosenbach quibbles about the reasons his investment was rejected, minimizing Empros's concerns by claiming that he was never charged with a crime in connection with his role at Galleon, *see* Opp'n 5, and that his disclosure of the terms of his prospective investment to an Empros competitor did not technically violate any confidentiality commitments, *see id.* at 7, 9–10. Critically, these were not Rosenbach's judgment calls to make, as Empros possessed at all times the absolute right to reject Rosenbach's investment for whatever reason. To Empros, both Rosenbach's reputational risk and inability to adhere to Empros's confidentiality admonitions gave Empros concerns that drove it to reject Rosenbach. His second-guessing of these decisions is irrelevant.

1 contained.  Opp'n 19–21.  The argument lacks any merit.  In *Vita Planning*, the plaintiff sued for breach

2 of the very contract containing the forum selection clause it then claimed should not be binding.  192 Cal.

3 Rptr. 3d at 842, 845.  By contrast, Empros is not suing Rosenbach for breach of the confidentiality

4 provisions or arguing that those provisions were *contractually enforceable* against Rosenbach.  Rather,

5 Rosenbach's failure to abide by the provisions within hours of him signing the Draft Documents was one

6 of the reasons Empros rejected Rosenbach's investment.  This is not an admission—then or now—that the

7 parties at that time had an enforceable contract.[15]

8 Ultimately, the issue before the Court boils down to the fact that the Draft Documents' arbitration

9 clauses never became binding because those Draft Documents required signatures by specified parties that

10 never signed: Empros, the Manager, and the Fund.  The Court should not be distracted from that fact by

11 Rosenbach's detour through irrelevant aspects of the parties' limited course of dealing.  Under established

12 California precedent, the absence of the required signatures on the Draft Documents precludes arbitration

13 of this dispute.  Empros is thus likely to succeed on the merits of its claim that the parties' dispute should

14 not be arbitrated.

15 **B.   Empros Will Suffer Irreparable Injury if Forced to Arbitrate.**

16 Being forced to arbitrate claims in the absence of an arbitration agreement constitutes irreparable

17 injury to Empros as a matter of law.  Rosenbach does not dispute this.  Instead, he claims that the threat of

18 irreparable injury is too remote because "the AAA has agreed to hold the arbitration in abeyance until this

19 proceeding is completed."  Opp'n 21.  He is wrong.  The AAA document Rosenbach cites states only that

20 the matter has been placed in abeyance, without any reference to this litigation or statement about how

21 long the abeyance will last.  *See* Sullivan Decl. Ex. E.  Indeed, without a preliminary injunction, there is

22 nothing preventing Rosenbach from reviving the arbitration at any time.[16]

23 ---

[15] Unlike Rosenbach, who quickly escalated matters with threats against Empros, Empros never even
24 *threatened* to sue Rosenbach for his disclosure of his potential investment and its price to an Empros
25 competitor.  Instead, Empros simply declined to proceed to the next step—an investment agreement with
Rosenbach.

26 [16] Rosenbach suggests that Empros was somehow derelict because it did not object to arbitrability to the
AAA before bringing this lawsuit.  *See* Opp'n 11.  But he never explains the relevance of this contention,
27 and in any event, Empros objected to the AAA's jurisdiction on the day its answer to Rosenbach's
Statement of Claim was due, consistent with AAA rules. *See* AAA Com. Arb. R. R-7(c).  Rosenbach has
28 provided no reason (to the AAA or this Court) why the objection should have been made sooner.

1    Rosenbach's apparent concession that he will hold the AAA arbitration in abeyance "until this

2    proceeding is completed" in fact carefully maintains an ambiguity regarding Rosenbach's intentions.

3    Specifically, it is not clear whether "this proceeding" refers to this entire litigation or simply the Court's

4    resolution of Empros's Motion.  But if Rosenbach really intended to allow this Court to finally resolve the

5    question of arbitrability and then the parties' underlying dispute before reviving the arbitration, there would

6    be no reason for him to resist the preliminary injunction Empros is seeking.  Indeed, Rosenbach has refused

7    to consent to such an injunction.  Rosenbach's argument that the prospect of arbitration is too remote

8    cannot be credited as long as he retains full discretion to revive the arbitration.

9    For this reason, Rosenbach's citation of *Recycle for Change v. City of Oakland*, No. 15-CV-5093-

10   WHO, 2016 WL 344751 (N.D. Cal. Jan. 28, 2016), is inapposite.  That case involved a nonprofit's

11   challenge to a city ordinance regulating donation boxes for used clothing.  The nonprofit alleged that the

12   ordinance would cause it to lose 90% of its donation boxes, but the court found no imminent threatened

13   injury where the actual impact of the ordinance was "undetermined" and the nonprofit had not yet applied

14   for any permits under the ordinance.  *Id.* at \*7.  Here, by contrast, the parties agree that the potential harm

15   to Empros is irreparable, and in the absence of a preliminary injunction, Rosenbach retains the ability to

16   inflict that harm at any time.  Empros thus satisfies the irreparable harm element of the preliminary

17   injunction test.

18   **C.    <u>The Balance of Equities and Public Interest Weigh in Favor of an Injunction</u>.**

19   Rosenbach's arguments on the final two elements of the test are similarly unavailing.  With respect

20   to the balance of equities, as explained above, as long as Rosenbach retains the ability to revive the

21   arbitration, Empros faces the burden of arbitrating against its will—a burden that Rosenbach does not

22   dispute is substantial.  On the other side of the ledger, Rosenbach complains that litigating in court deprives

23   him of the advantages of arbitration; but that is of no moment given that, in the absence of an agreement

24   to arbitration, Rosenbach had no right to those advantages in the first place.

25   With respect to the public interest, it is well established that "[t]he federal policy favoring

26   arbitration does not apply to the determination of whether there is a valid agreement to arbitrate between

27   the parties."  *Comer v. Micor, Inc.*, 436 F.3d 1098, 1104 n.11 (9th Cir. 2006) (quoting *Fleetwood Enters.,*

28   *Inc. v. Gaskamp*, 280 F.3d 1069, 1073 (5th Cir. 2002)).  As demonstrated in Empros's opening

memorandum, where, as here, there is no valid arbitration agreement, the public interest favors injunctive relief.  *See* Mem. 18–19.  Rosenbach's recycling of his argument that Empros must be bound by the arbitration clauses in the Draft Documents because Empros drafted them is once again unpersuasive.  As explained above, Empros drafted the Draft Documents so as to ensure that their provisions—including the arbitration provisions—would not become binding unless Empros, the Manager, and the Fund signed the documents.  Empros may have preferred to arbitrate disputes with *actual* members of the Fund, but that does not mean that it should be required to arbitrate disputes with *potential* members whose applications were so clearly rejected.

### III.    CONCLUSION

There is no arbitration agreement between the parties.  The arbitration clauses on which Rosenbach relies are contained in Draft Documents that never became binding, because by their express terms they could not become binding unless signed by all specified parties, which never happened here.  None of the other facts floated by Rosenbach should distract the Court from that fatal defect in Rosenbach's position.  Empros respectfully requests that the Court grant Empros's Motion for a Preliminary Injunction staying the AAA Arbitration.

Dated:  October 28, 2020

JENNER & BLOCK LLP

By:

TODD C. TORAL

ttoral@jenner.com
633 West 5th Street
Los Angeles, CA  90071-2054

BRIAN J. FISCHER (*pro hac vice*)
bfischer@jenner.com
RÉMI J.D. JAFFRÉ (*pro hac vice*)
rjaffre@jenner.com
919 Third Avenue
New York, NY  10022-3908

Attorneys for Empros Capital LLC