1
2
3
4                    UNITED STATES DISTRICT COURT
5                   NORTHERN DISTRICT OF CALIFORNIA
6
7   EMPROS CAPITAL LLC,                    Case No.  3:20-cv-06788-WHO
8              Plaintiff,
                                           **ORDER ON PRELIMINARY**
9       v.                                 **INJUNCTION; ADMINISTRATIVE**
                                           **MOTIONS TO SEAL**
10  GARY ROSENBACH,
                                           Re: Dkt. Nos. 2, 6, 10, 11
11             Defendant.

12          Plaintiff Empros Capital LLC ("Empros") moves for a preliminary injunction to enjoin an

13  arbitration commenced against it by defendant Gary Rosenbach.  Rosenbach contends that the

14  parties agreed to a sale of stocks that Empros is not honoring.  Empros argues that no contract,

15  including an agreement to arbitrate, was ever formed.  I agree with Empros that, on this record, the

16  parties never agreed to arbitrate, so it has shown a likelihood of success on the merits.  But since

17  the arbitration has now been withdrawn, there is no threat of irreparable injury.  The motion is

18  DENIED.[1]

19                            **BACKGROUND**

20          The facts at this stage are drawn from Empros's verified complaint and other materials

21  supported by sworn declaration submitted by the parties.

22          Empros is a venture capital firm incorporated under California law.  Verified Complaint

23

24  _____
    [1] After I made clear during oral argument that, based on the record before me, defendant had not
25  shown that any contract existed, let alone an agreement to arbitrate, defense counsel indicated that
    he would withdraw the arbitration and file a lawsuit in state court.  He asked that I not issue any
26  written order.  I expect that there will be future litigation over whether this or another court is the
    appropriate forum for the parties' dispute, so it seems appropriate to articulate the basis for my
27  ruling on the motion before me.  Rosenbach argued in his notice of withdrawal of the arbitration
    that the motion for a preliminary injunction was now moot.  The withdrawal, however, came about
28  as a result of Rosenbach's voluntary cessation of the activity as a result of my tentative ruling;
    issuing an order is appropriate.

United States District Court
Northern District of California

United States District Court
Northern District of California

("Compl.") [Dkt. No. 1] ¶¶ 11, 18. Empros is owned by Alex Fishman who is domiciled in San Francisco, California. *Id.* ¶ 11. It is the "sponsor" of the Empros Enterprise Data Technologies Fund II, LLC (the "Fund"), a private investment fund that "permits its investors to gain exposure to shares of" Palantir Technologies ("Palantir"). *Id.* ¶¶ 4, 18. Rosenbach is an investor who, according to the Complaint, is a resident of Colorado. *Id.* ¶¶ 12, 16.

On June 9, 2020, Rosenbach's broker-dealer Matt Weisbarth "contact[ed] Fishman to inquire about investing $1–2 million in the Fund." *Id.* ¶ 20; *see* Compl. Ex A [Dkt. No. 1-1] at 3. He did not initially identify the buyer as Rosenbach. Compl. Ex. A at 1–3. After Weisbarth's first email, Fishman responded, "Yes sure. Free to connect tonight?" *Id.* at 3. On June 10, Weisbarth wrote that "the $2 mill guy" would invest. *Id.* at 3. He laid out how many shares the investor would buy, at what price, and the details involved in splitting the origination fee. *Id.* He said, "Let me know if that's correct and then let me know how my back office should paper this one up." *Id.* Fishman responded several hours later: "Terrific." *Id.* He asked for the investment vehicle's name and the investor's email address and said Empros would "send him a link with closing details . . . and wiring instructions." *Id.* In response to a follow-up email, Fishman also wrote "[w]e need to get this funded by Friday," an Empros employee "will be able to send out docs a few hours after we have info," and he was "[l]ooking forward to closing and having one done with you." *Id.* at 1; Compl. ¶ 21. Weisbarth wrote back that "[t]he buyer is Gary Rosenbach." Compl. Ex. A at 1.

Later on June 10, the Empros employee sent Rosenbach the email. Compl. Ex. B [Dkt. No. 1-2]. It began, "Good evening, we are thrilled to have you be a part of our fund." *Id.* at 2. It stated that the email "included our confidential fund documents . . . for your review and signature." *Id.* It identified four documents. The first was the "Private Placement Memorandum," which, the email said, "is for your information as the subscriber to the fund and does not require a signature." *Id.* Second, the "Operating Agreement . . . [e]xplain[ed] the terms of the fund"; the email said it "governs all investors in the fund and will be executed, by the Sponsor (Empros Capital), the Manager (Assure Services, our 3rd Party Manager), and you as a new Member of the Fund." *Id.* Third, the "Subscription Agreement . . . govern[ed] the individual

2

subscription to the fund and covers some of our KYC/AML [Know your Client/Anti-Money Laundering] required documentation." *Id.*; Compl. ¶ 23.  Fourth, the "Certification of Designation" discussed the "specifics of [Rosenbach's] investment."  Compl. Ex. B at 2.  The Empros employee explained that she had "prepared electronic signature packages for each of the entities that will be investing."  *Id.*  The email then said, "Please click below to execute on behalf of each entity" that would be investing on Rosenbach's behalf and included a hyperlink for each. *Id.*; *see also* Compl. ¶ 21 (discussing the three entities).  The email also discussed wiring Empros money and stated, "please let us know when the wires have been intiated [sic] so we can promptly confirm receipt.  Its [sic] critical that we receive your wire by Monday June 15th, so please be sure to initiate it by Friday June 12th."  Compl. Ex. B at 2–3.  Finally, the last item in the email, below the employee's signature block, was a hyperlink to an "Email Disclaimer."  *Id.* at 3.  The hyperlink opened a page on the website of Empros's broker-dealer that stated, among other things,

> This material may not be suitable for all investors and is not intended to be, nor shall it be construed as legal, tax or investment advice or as an offer, or the solicitation of any offer, to buy or sell any securities, nor shall there be any sale of securities in any jurisdiction in which such offer, solicitation or sale would be unlawful.  Any such offer or solicitation may only be made by means of delivery of an approved confidential offering memorandum.  Any other information provided herein is for informational purposes only and should not be deemed as a recommendation to buy or sell securities.

*Id.* at 4; Compl. ¶ 24.

The Private Placement Memorandum, Operating Agreement, Subscription Agreement, and Certificate of Designation (collectively, the "Fund Documents") contain language that Empros contends shows that no contract can be formed until all parties sign and that it had the ability to reject Rosenbach and terminate the transaction at any time.  *See* Compl. ¶¶ 38–50.  The current dispute centers on this language, which I discuss in detail below.  Rosenbach executed (via electronic signature) the three Fund Documents that required his signature and returned them to Empros on June 11.  Compl. ¶ 58.  He then wired the required funds from two of his investment vehicles but not from his personal IRA the next day, June 12.  *Id.*

Empros alleges that "[o]ver the weekend of June 13 and 14," it "reviewed the information provided by Rosenbach and realized that Rosenbach was the same Rosenbach who had co-

United States District Court
Northern District of California

founded Galleon, [a] hedge fund that buckled under an insider trading investigation and prosecutions." *Id.* ¶ 59.  Additionally, Empros alleges that it learned that "Rosenbach had disclosed his prospective investment, as well as the pricing terms the parties had discussed, to one of Empros's most significant competitors." *Id.* ¶ 60.  That disclosure, Empros alleges, "violated the confidentiality provisions in the [Fund] Documents." *Id.*  Empros also claims that, confidentiality provisions aside, "any seasoned investor like Rosenbach would have known that this information was to be kept confidential." *Id.*

On June 14, Weisbarth sent Fishman an email that Empros characterizes as "attempting to salvage the deal." *Id.* ¶ 61.  The Complaint is silent about any communications that happened between Empros's alleged discovery of the negative information about Rosenbach and this email. It does not state, for instance, what communications occurred between the parties—if any—that indicated the deal might not go through.  Weisbarth's June 14 email references confusion by one of Rosenbach's employees about his investment in Palantir via Empros and a separate investment in Palantir via a different firm.  *See* Compl. Ex. R [Dkt. No. 1-18] at 2.  According to Weisbarth, Rosenbach's assistant "got confused" between the documents from each firm and "questioned the price" of the Empros investment as a result.  *Id.*  The email stated that it was an "honest mistake" and that Rosenbach "still obviously want[s] to move forward with you [sic] trade.  I explained to him that was 100% up to you." *Id.*  That evening, Rosenbach wrote to Fishman, "Sorry about the confusion today.  My assistant made a mistake and sent an email on a deal that I closed last week with another group.  He got confused on the pricing and sent the email by mistake to you plus the wrong group.  I look forward to moving forward on this deal and hopefully more in the future." Compl. Ex. S. [Dkt. No. 1-19] at 2.

Empros claims that it "informed Rosenbach of its decision to reject Rosenbach's request to invest in the Fund" on June 15.  Compl. ¶ 63.  It alleges that neither it nor the Fund's manager executed any of the Fund Documents that required their signature.  *Id.*  It also asserts that other steps necessary to consummate investment in the Fund were not completed, including placing Rosenbach or his investment entities in the Fund's "Interest Register" or executing an "Acceptance of Subscription." *Id.*  The exhibits it has provided paint a slightly more complicated

picture of the parties' interactions.  Empros does not state by what means it "informed" Rosenbach

of the decision and includes no exhibit, such as an email or text message.  A series of text

messages between Fishman and Weisbarth on June 15 show the situation gradually deteriorating.

*See* Compl. Ex. U [Dkt. No. 1-21].  In the morning, Weisbarth asked Fishman "What are ur

thoughts.  I need to call Gary soon." *Id.* at 5.  Over the next several hours, Weisbarth sent

Fishman a series of messages repeatedly asking for updates and for Fishman to contact

Rosenbach. *Id.* at 5–6.  Fishman repeatedly responded he would get back to Weisbarth and

Rosenbach. *Id.*  Over the day, Weisbarth said that Rosenbach was getting more and more upset at

the lack of response.  In a conversation that began at 8:51 am, Weisbarth wrote that Rosenbach

was "ok with you not wanting to do the trade with him.  He just needs to know." *Id.* at 6.  At 1:50

pm Weisbarth said Rosenbach "is losing patience slowly." *Id.*  At 2:27 pm, Fishman emailed

Empros's bank and requested that it return the wires from the Rosenbach entities.  Compl. Ex. T

[Dkt. No. 1-20] at 3.  Later, after 4:00 pm, Weisbarth said that Rosenbach was "so mad." *Id.*

Finally, in the evening, the two agreed they would call Rosenbach together and, the next morning

(June 16), Weisbarth texted to ask what time Fishman wanted to do that call. *Id.* at 7–8.

On June 19, it appears that Fishman was still trying to find a way to have Rosenbach invest

in Palantir. *See id.* at 8–10 (writing on June 19 that Fishman "may still be able to get [Rosenbach]

. . . In").  The Complaint characterizes these efforts as coming from "concern[] about the

ramifications of" not "accommodate[ing] a powerful investor."  Compl. ¶ 65.  On July 2, 2020,

Fishman wrote, "Ok, I actually have something for him" and "Not quite what he wants but

something." *Id.* at 9.  Soon after, Weisbarth said, "Just spoke to [Rosenbach]. He's very excited.

Thank u Alex.  Just curious how u can get it at this price ?!!" *Id.* at 9.  But, by July 6, Weisbarth

wrote, "Alex, Gary is not someone to mess with.  This is not going in the right direction.  I can

[sic] stress enough that you need to communicate with him." *Id.* at 10.  And, on July 7,

Rosenbach himself sent Fishman a string of messages including "Big mistake," "Your word is

supposed to be your bond it's a shame in my entire career I have never faced anything or anyone

like you," and that the money wired to Empros "sure sounds like acceptance."  Compl. Ex. V

[Dkt. No. 1-22] at 2.

On September 8, 2020, Rosenbach initiated an arbitration proceeding against Empros, claiming it violated their contract. Compl. ¶ 68. Empros was notified of the arbitration on September 15. *Id.* On the day of its deadline to respond to the arbitration, September 29, Empros filed suit in this Court seeking declaratory and injunctive relief against the arbitration. *See id.* The next day, it moved for a temporary restraining order ("TRO") halting the arbitration. *See* Ex Parte Motion and Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction [Dkt. No. 10]. Prior to the hearing on the TRO, counsel indicated that the American Arbitration Association ("AAA") had placed the arbitration in abeyance at the parties' request. *See* Dkt. No. 19. Because of this, there was no need to proceed on an expedited basis and I determined that I would treat the motion for a TRO as a motion for a preliminary injunction that could proceed according to a normal briefing schedule. *Id.* Both parties have now fully briefed the issue. I held a hearing on the motion on November 10, 2020. At that hearing, I indicated that I was likely to find for Empros on the likelihood of success on the merits. Rosenbach's counsel indicated that he planned to withdraw the arbitration and file a case in state court. Counsel has communicated to me since then that the arbitration has been withdrawn.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." S*ee Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

**DISCUSSION**

**I.    PRELIMINARY INJUNCTION**

Empros has shown a likelihood of success on the merits of its claim:  On this record, it is clear that the parties never mutually assented to the alleged arbitration agreement.  But Empros has not shown that it faces a likelihood of irreparable injury because the arbitration it challenges was held in abeyance and is now withdrawn.

**A.   Likelihood of Success on the Merits**

Empros argues it is likely to succeed on the merits of its claim that there is no contract that compels it and Rosenbach to arbitrate.  *See generally* Memorandum of Points and Authorities in Support of Empros's Motion ("Mem.").  I agree; on this record, no arbitration agreement was mutually assented to.

"It is a settled principle of law that arbitration is a matter of contract."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks omitted).  As such, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986) (internal quotation marks and citation omitted).  To determine whether an arbitration agreement exists, federal courts apply ordinary state contract law.  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

The parties generally apply the law of California, where Empros is incorporated and apparently operates from.  *See, e.g.*, Mem. 11; Opposition to the Motion for Preliminary Injunction ("Oppo.") [Dkt. No. 27] 15.  Empros admits that the law of Colorado (Rosenbach's state of residence) might theoretically apply, *see* Mem. 13 n.2; Rosenbach says it may be California, Colorado, or New York (the latter for reasons he does not explain), *see* Oppo. 14 n.14.  Empros also asserts that Delaware law would apply if a contract had in fact been formed.  Mem. 13 n.2.  As I explain, however, this dispute involves an issue of the most fundamental contractual question: whether there was mutual assent to a contract.  The parties have not pointed to any salient difference in these states' laws that would—especially at the preliminary-injunction stage—create a material difference between them.  *See Kearney v. Salomon Smith Barney, Inc.*, 39

7

1    Cal. 4th 95, 107–08 (2006) (determination of the choice of law is only necessary when there is a

2    difference between the laws that creates a "true conflict"). Taking the parties' lead, I often rely on

3    cases applying California law, but note the agreement of the laws of those other states and general

4    principles of contract law.

### 1. The Parties Never Formed a Contract

6        A valid contract requires the "mutual consent of the parties," which is "generally achieved

7    through the process of offer and acceptance." *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App.

8    4th 800, 813 (2012) (internal citations omitted). Whether such consent occurred is determined

9    under an objective standard based on the parties' "outward manifestations or expressions" and

10   "the reasonable meaning of their words and acts, and not their unexpressed intentions or

11   understandings." *Id.*[2] Whether a certain set of facts establishes a contract is a question of law.

12   *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016).

13       The only possible way the parties here would have consented to arbitrate is if their dealings

14   created a contract. The question is therefore whether the parties' words and acts, reasonably

15   understood, show mutual assent to be bound. On the record as it has been presented to me, no

16   contract was formed, let alone a valid agreement to arbitrate.

17       "When it is clear, both from a provision that the proposed written contract would become

18   operative only when signed by the parties as well as from any other evidence presented by the

19   parties that both parties contemplated that acceptance of the contract's terms would be signified by

20   signing it, the failure to sign the agreement means no binding contract was created." *Banner*

21   *Entm't, Inc. v. Superior Court (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 358 (1998), *as*

22   *modified* (Mar. 30, 1998). But if the "parties orally agreed upon all of the terms and conditions of

23   a proposed written agreement with the mutual intention that the oral agreement should thereupon

24   become binding, the mere fact that a formal written agreement to the same effect has not yet been

25   signed does not alter the binding validity of the oral agreement." *Id.* As always, the touchstone is

---

27   [2] *Accord* Restatement (Second) of Contracts §§ 3, 18; *PayoutOne v. Coral Mortg. Bankers*, 602 F.
     Supp. 2d 1219, 1224 (D. Colo. 2009); *Crum v. April Corp.*, 62 P.3d 1039, 1040–41 (Colo. App.
28   2002); *Indus. Am. v. Fulton Indus.*, 285 A.2d 412, 415 (Del. 1971); *Brown Bros. Elec. Contractors*
     *v. Beam Const. Corp.*, 361 N.E.2d 999 (N.Y. 1977).

United States District Court
Northern District of California

the parties' intent.  Parties can intend—as objectively understood through their words and acts—that a contract be binding only upon formal execution, or they can intend that formal execution is not required to be bound.  *See id.*; *see also First Nat. Mortg. Co. v. Fed. Realty Inv. Tr.*, 631 F.3d 1058, 1065 (9th Cir. 2011) ("Where there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done." (internal quotation marks and alterations omitted)).  Courts have consistently applied this framework to determine whether parties intended to require formal execution or not.  *See, e.g.*, *Jafari v. F.D.I.C.*, No. 12CV2982, 2015 WL 3604443, at *6 (S.D. Cal. June 8, 2015); *Atlantique Prods., S.A. v. Ion Media Networks, Inc.*, No. CV128632, 2014 WL 11820243, at *5 (C.D. Cal. Jan. 31, 2014), *aff'd*, 644 F. App'x 800 (9th Cir. 2016).[3]

The Fund Documents that formed the core of the putative contract were clear about what would be required for a binding contract to be formed.  The Operating Agreement provided that, "The Manager (with the prior approval of the Sponsor [Empros]) may admit any Person as a Member upon signing a counterpart of this Agreement."  *See* Compl. Ex. D at 9.  At the bottom, it included signature lines for Rosenbach, Empros, and the Manager of the Fund.  *Id.* at ECF 42–43.  The Subscription Agreement provided that Rosenbach "shall be admitted as a Member in the Fund ("Member") at the time this Subscription is accepted *and executed by the Manager*."  *See* Compl. Ex. E at 2 (emphasis added).  It further stated that it was "effective as of the date set forth above the Manager's signature on the Acceptance of Subscription page of this Agreement."  *Id.*  To drive the point home, yet another section provided

> The Manager, on behalf of the Fund, subject to the approval of the Sponsor, may accept or reject this Subscription, in whole or in part, in its sole discretion, subject to the approval of the Sponsor. This Subscription shall be deemed to be accepted by the Manager and this Agreement shall be binding against the Manager *only upon execution and delivery to the Subscriber of the Acceptance of Subscription attached hereto*.

*Id.* (emphasis added).  And it included a signature line for the Fund's manager preceded by the statement that, "By signing below, the Fund hereby accepts Subscriber's subscription for Interests

---

[3] *Accord* Restatement (Second) of Contracts § 27 & comm. a–b.; *Mohler v. Park Cty. Sch. Dist. RE-2*, 515 P.2d 112, 114 (Colo. App. 1973); *Ellis Canning Co. v. Bernstein*, 348 F. Supp. 1212, 1122–23 (D. Colo. 1972); *Schwartz v. Chase*, No. CIV.A. 4274, 2010 WL 2601608, at *8 (Del. Ch. June 29, 2010); *Scheck v. Francis*, 250 N.E.2d 493 (N.Y. 1970).

in the Fund in the amount indicated on the Signature Page to Subscription Agreement." *Id.* at 16.

It is evident from these repeated statements across two of the three documents that required signature that the parties intended any contract to be complete only upon proper execution through signing. *See, e.g.*, *Jafari*, 2015 WL 3604443, at *6 ("The . . . letter states '[t]his letter shall not be binding upon, or effective against, any party signing a counterpart unless and until all parties have signed counterparts.' It's undisputed that ALB never signed the letter. In the context of the document as a whole it's difficult to conclude that the quoted sentence means anything other than what it plainly says: that the agreement is not binding until all parties have signed." (some internal quotation marks and alterations omitted)); *Atlantique*, 2014 WL 11820243, at *5 ("Here, the uncontroverted facts demonstrate that the understanding between the parties in negotiating the agreement was that the term sheet had to be signed by both parties in order to be valid."). Rosenbach does not dispute that the Fund Documents were given to him unsigned and that the required parties on Empros's side never executed them. A reasonable person would understand that no contract was operative until the documents were fully executed.

Other provisions of the Fund Documents reinforce this conclusion. *See First Nat. Mortg.*, 631 F.3d at 1065 ("In the absence of ambiguity [whether formal execution is required] must be determined by a construction of the instrument taken as a whole."). By their plain language, the Fund Documents permitted Empros to reject Rosenbach even after he signed the documents and wired the requisite funds. They stated, for instance, that Empros "reserves the right to accept or reject any subscription, in whole or in part." Compl. Ex. C at 4; *see also id.* at 34 ("The Sponsor may accept or reject any subscription in whole or in part, in its sole discretion, for any reason whatsoever, and to withdraw the Offering at any time. In the event the Sponsor refuses to accept a Subscriber's subscription, any subscription funds received will be returned without interest."). Accordingly, on these facts, the requirement of formal execution was not a mere formality; it served a substantive, important purpose to the parties.

The requirement of formal execution makes particular sense in light of the complexity of the transaction. Despite the informal nature of some of the parties' (or their agents') communications on this record, the ultimate transaction here involved substantial amounts of

United States District Court
Northern District of California

money governed by dense, lengthy provisions.  The Fund Documents are dozens of pages long, highly detailed, and clearly intended to occur between sophisticated parties.  The parties' communications show large sums of money being bargained over and decisions being made at high speeds.  It is natural that, in this environment, Empros would retain the ability to reject Rosenbach, or any other potential investor.  The requirement of formal execution ensured it possessed this authority.  It also removed uncertainty over whether a contract had been formed by imposing a bright-line rule in the plain language of the contract.

In short, the Fund Documents repeatedly made explicit that the creation of a binding agreement was contingent on execution via signature.  They also were clear that there was a good reason for this requirement: to retain Empros's power to reject Rosenbach or other putative subscribers.  Accordingly, the parties' intent, determined objectively through their actions, shows that they never mutually assented to arbitrate.

### 2.   Rosenbach's Counterarguments are Unpersuasive

Rosenbach has several responses.  Notably he does not contest that he was sent unsigned versions of the Fund Documents, the relevant signatures never occurred, and Empros communicated to him that it was rejecting him as an investor.

Rosenbach primarily argues that when "an agreement has been reached that governs all the principal terms, a lack of signature on documents formalizing that agreement does not mean that no contract was formed."  Oppo. 13.  It is true that, as I have discussed, an agreement on all material terms can result in formation of a contract despite a lack of formal signature.  *See Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 313–14 (9th Cir. 1996).  But, as I have also discussed, that is not so where, as here, the parties unambiguously demonstrate their intent that the contract be predicated on formal execution.  *First Nat. Mortg.*, 631 F.3d at 1065.  Both of the cases Rosenbach relies on accord with these principles and neither concerned contracts whose express provisions required formal execution to become effective.  *See Angell v. Rowlands*, 85 Cal. App. 3d 536, 540–42 (1978); *Brighton Inv., Ltd. v. Har-ZVI*, 88 A.D.3d 1220, 1222–23 (N.Y. App. Div. 2011).  Indeed, both explicitly embraced the framework I apply here.  *Angell* explained that "a contract is invalid if not signed by all parties purportedly bound [o]nly when it is shown, either by

United States District Court
Northern District of California

1    parol or express condition, that the contract was not intended to be complete until all parties had

2    signed." 85 Cal. App. At 542. *Brighton* held that the contract there was "ambigu[ous] as to

3    whether the parties intended to be bound . . . before it was formally signed" and cited a group of

4    cases holding that the determinative question is whether the parties intended the contract to be

5    valid only upon formal signature. 88 A.D.3d at 1223 (citing, *e.g.*, *Scheck*, 260 N.E.2d at 493 ("It

6    is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is

7    reduced to writing and signed by both of them, they are not bound and may not be held liable until

8    it has been written out and signed.")).

9        Rosenbach relies on several specific pieces of evidence to attempt to demonstrate that,

10   contrary to the Fund Documents' language, the parties intended to form a contract without formal

11   execution.

12       Rosenbach's primary evidence is the June 10 email. Oppo. 14–16. As noted, that email

13   came from an Empros employee and included links to the Fund Documents for Rosenbach to sign.

14   Compl. Ex. B. Rosenbach points out that the email began, "Good evening, we are thrilled to have

15   you be a part of our fund." *Id.* at 2. First, Rosenbach contends that this statement "itself can

16   constitute acceptance of the contracts at issue, and constitutes an email signature." Oppo. 14.

17   More broadly, he argues that the June 10 email is evidence that the parties' entire course of

18   dealings shows they intended to be bound. I disagree. To start, the remainder of the email directs

19   Rosenbach to the Fund Documents and, as explained, those documents repeatedly and explicitly

20   provide that no agreement will exist until they are signed by Empros and that Empros retained the

21   ability to reject Rosenbach. It is clear that, in context, this greeting was not reasonably intended to

22   signal finalization of the agreement that the remainder of the email contemplated. Additionally,

23   Rosenbach points to no authority for the proposition that a single form greeting (such as "we are

24   thrilled to have you be part of our fund") can overcome the repeated, express provisions of the

25   comprehensive documents that lay out the material terms of the contract.

26       Even if that were not so, Rosenbach's broader argument does not persuade. Not all

27   "material terms" had been agreed to by the point when the June 10 email was sent. *Banner*, 62

28   Cal. App. 4th at 358. At most, the parties had agreed on the number of Palantir shares and their

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1    price; but the Fund Documents contain a web of numerous other provisions, many of which can

2    only be classified as material.  Among many other issues that were unresolved when the June 10

3    email was sent—but would be resolved when all signatories signed the Fund Documents—are

4    what Rosenbach would have to submit to obtain Empros's approval, or even whether Empros's

5    approval would be required.  Without the Fund Documents, moreover, there is no evidence the

6    parties intended to submit disagreements to arbitration; given Rosenbach's invocation and

7    vigorous defense of the arbitrability of his claims, that choice may well be material.  In all events,

8    there is no evidence on this record that there was mutual assent to all material terms and

9    conditions of the contract in any form except the Fund Documents.[4]

10           Rosenbach also argues that the June 10 email "makes clear that Empros *will* sign the

11   Operating Agreement, making the actual application of the signature an objectively *pro forma*

12   act."  Oppo. 14–15 (emphasis in original).  The only portion of the email that arguably supports

13   this inference is the email's statement that the Operating Agreement "governs all investors in the

14   fund and will be executed, by the Sponsor (Empros Capital), the Manager . . . , and you as a new

15   Member of the Fund."  Compl. Ex. B.  If anything, however, this statement reinforces that

16   execution via signature *is* required.  To the extent that Rosenbach's argument is that the use of the

17   word "will" obligates Empros to sign, I reject it.  In context, the statement that the documents

18   "will be executed" by various parties means that those are the signatures the document requires.

19   That is the only interpretation that aligns with plain language of the Fund Documents themselves.

20   The statement is synonymous with "the Operating Agreement needs to be executed by" the named

21   parties.  In any event, as I have explained, the signature requirement is not, as Rosenbach argues, a

22   pro forma act:  It effectuated Empros's ability to reject investors, a power the Fund Documents are

23   explicitly concerned with preserving.

24           Rosenbach also points to a communication from Fishman to Pacific Premier Trust that he

25   characterizes as "represent[ing] . . . that Mr. Rosenbach had a new investment with Empros."

26   

27   [4] Empros also relies on the hyperlink at the bottom of the email that, when clicked, led to the
     disclaimer discussed above.  There is no need to address the parties' dispute over this disclaimer
28   because I conclude that the June 10 email did not create a contractual obligation.

Oppo. 15; *see* Declaration of Katherine M. Sullivan ("Sullivan Decl.") [Dkt. No. 27-1] Ex. B. at ECF 9–12.  Rosenbach does not indicate what in that email he considers to be such a representation.  In any case, that email simply shows Fishman's attempts to facilitate the transaction; such facilitation only demonstrates preparation for the agreement to go through, not that a contract had already been formed contrary to the Fund Documents' plain language.[5]

Next, Rosenbach appears to contend that whether a contract was formed is itself an issue for arbitration, not judicial determination, because the arbitration clause in the Subscription Agreement "includes all disputes arising not only out of the Subscription Agreement, but also out of Empros's offering of the Fund Interest."  Oppo. 13; *see also id.* 17.  He asserts that "the arbitration clause itself explicitly contemplates arbitration of pre-signing disputes in mandating arbitration of disputes arising out of the offering of the Fund Interests (suggesting disputes about the formation of the contract itself must go to arbitration[)]."  *Id.* 17.  This is question-begging.  "[T]he threshold issue is whether that document constituted a binding agreement at all.  If it did not constitute such an agreement, it follows that the arbitration provision is not enforceable."  *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016).[6]

Finally, Rosenbach asserts that Empros has admitted in this litigation that there was a valid contract.  Oppo. 19–21.  Rosenbach's argument is that "Empros has alleged that it rejected Rosenbach from the Fund because he breached confidentiality provisions in the offering documents."  *Id.* at 19–20.  To support that assertion, Rosenbach cites the Complaint's allegation that "Empros also learned that Rosenbach had disclosed his prospective investment, as well as the pricing terms the parties had discussed, to one of Empros's most significant competitors.  This violated the confidentiality provisions in the Subscription Documents."  Compl. ¶ 60.  Rosenbach is incorrect that this allegation is a judicial admission that a contract had been formed.  Reasonably

---

[5] If anything, the parties' post-June 10 behavior as a whole supports the inference that they did not believe a contract had been formed.  I conclude that, applying the objective standard, there was no mutual assent to begin with, so consideration of this evidence is unnecessary.

[6] Rosenbach also makes much of the fact that Empros, not him, drafted the Fund Documents.  He does not indicate why that fact would alter my analysis; the fundamental question is the parties' objective intent.

United States District Court
Northern District of California

1   understood, Empros was not pleading that there was already a contract and that Rosenbach

2   breached it by disclosing this information.  Nor was it arguing it was permitted to reject him as an

3   investor because of actual breach of these provisions.  Empros simply claims that what Rosenbach

4   did would violate the confidentiality provisions he was agreeing to.  Empros would not, for

5   instance, have been able to sue Rosenbach for breach of these confidentiality provisions because

6   no contract was formed.  It has not, as Rosenbach argues, undermined its theory of the case with a

7   subtle admission that there was a contract.[7]

8             **B.  Irreparable Injury**

9           Being compelled to arbitrate claims without having agreed to arbitrate them is an

10  irreparable injury.  *See, e.g.*, *Johnson v. Oracle Am., Inc.*, No. 17-CV-05157-EDL, 2017 WL

11  11493479, at *2 (N.D. Cal. Oct. 4, 2017); *AT&T Mobility LLC v. Bernardi,* No. C 11-03992 CRB,

12  2011 WL 5079549, at *10 (N.D. Cal. Oct. 26, 2011); *accord Merrill Lynch Inv. Managers v.*

13  *Optibase, Ltd.*, 337 F.3d 125, 129 (2d Cir. 2003).  A party would otherwise be "forced to defend

14  an improper arbitration demand [that] requires expending human and monetary capital for which

15  there is no adequate remedy at law."  *AT&T Mobility*, 2011 WL 5079549, at *10.

16          The difference in this case from a standard injunction against improper arbitration—and

17  the sole argument Rosenbach makes about irreparable injury—is that the arbitration here had been

18  held in abeyance at the parties' request and is now withdrawn.  Oppo. 21; *see* Sullivan Decl. Ex. E

19  at ECF 25.  Therefore, any injury from that arbitration, Rosenbach argues, is speculative and not

20  immediate.  *Id.*  I agree.  So long as the arbitration is held in abeyance or withdrawn, Empros faces

21  no concrete injury.

22            **C.  Balance of Equities and Public Interest**

23          The balance of equities tracks the merits and irreparable-injury analysis here.  Because

24

25  ───────────────

26  [7] Rosenbach relies on *Vita Planning & Landscape Architecture, Inc. v. HKS Architects, Inc.*, 240
    Cal. App. 4th 763 (2015).  There, a party attempted to argue it was not bound by a forum selection
    clause.  *Id.* at 844–45.  It admitted in its complaint, however, that it had "entered into a contractual

27  agreement, evidenced by a writing."  *Id.* at 845 (internal alteration omitted).  The court found that
    the forum selection clause was incorporated into the contract.  *Id.*  Here, as explained, Empros has

28  not "admitted" that it agreed to a contract.

United States District Court
Northern District of California

1   Empros never agreed to arbitrate, the burden on it in being compelled to do so is great.  *See AT&T*

2   *Mobility*, 2011 WL 5079549, at *11–*12; *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, No. SACV 13-

3   1934, 2014 WL 3721197, at *5 (C.D. Cal. July 22, 2014).  On the other hand, an injunction would

4   create no cognizable burden on Rosenbach because he is not party to an agreement to arbitrate

5   with Empros.  *Ingram*, 2014 WL 3721197, at *5.

6        To the extent the public interest is implicated, it too favors prohibiting arbitration where

7   there is no agreement to do so and the arbitration is not stayed.  *Id.*; *World Grp. Sec. v. Ko*, No.

8   C035055 EDL, 2004 WL 1811145, at *8 (N.D. Cal. Feb. 11, 2004).

9              **D.  Conclusion**

10       This record demonstrates that the parties never bound themselves to any contract, an

11   agreement to arbitrate.  Empros has shown a likelihood of success on the merits.  But because the

12   challenged arbitration is now withdrawn, there is no threat of irreparable injury to Empros.  The

13   motion for a preliminary injunction is DENIED.

14  **II.      MOTIONS TO SEAL**

15       Empros has also filed two administrative motions to seal, respectively, portions of its

16   complaint and Motion, as well as their related exhibits.  Dkt. Nos. 2, 11.  I GRANT IN PART and

17   DENY IN PART those motions.

18       Courts "start with a strong presumption in favor of access to court records."  *Foltz v. State*

19   *Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003).  The public possesses an

20   important right to inspect public records, including judicial records.  *Ctr. for Auto Safety v.*

21   *Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016).  Accordingly, when a party seeks to seal

22   judicial records connected to a motion—such as the one at issue here—that is "more than

23   tangentially related to the underlying cause of action," it "must demonstrate that there are

24   'compelling reasons' to do so."  *Id.* at 1096–99.  "When ruling on a motion to seal court records,

25   the district court must balance the competing interests of the public and the party seeking to seal

26   judicial records."  *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115,

27   1119 (9th Cir. 2012).  Further, this District's local rules require that requests to seal be "narrowly

28   tailored to seek sealing only of sealable material."  CIV. L. R. 79-5(b).

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6

The motions are DENIED to the extent they seek to redact the identity of Palantir as the company Rosenbach wanted to invest in.  The parties have already revealed that fact in their non-redacted briefing.  *See, e.g.*, Oppo. 8; Reply 12.  Even if they had not, I would deny the request because Empros has not shown there are compelling reasons to redact its identity.  The motions are also DENIED with respect to the price term for the shares and Weisbarth's name because those were revealed in Rosenbach's briefing.  *See, e.g.*, Oppo. 8.

7
8
9
10
11
12
13
14

The first motion is GRANTED IN PART with respect to the Fund Documents.  I will not, however, seal the entire documents as Empros requests.  It is the rare circumstance in which an entire document is sealable, as opposed to the narrow tailoring the law requires.  *See* CIV. L. R. 79-5(b). Empros may not redact any portion of the documents referenced by either party or in my Order, because those are the provisions central to this dispute.  But there are compelling reasons to seal the provisions of those otherwise confidential documents that are unrelated to the issue here. Empros must submit unsealed versions of those documents that redact only provisions not referenced in the briefing or my Order.

15
16
17
18
19
20
21

The motions are otherwise GRANTED.  Many of the other redactions concern personal identifying or contact information (such as phone numbers and email addresses); there is no public interest in that information but its dissemination could easily cause harm to those individuals.  The remaining redactions are of confidential business or financial information, such as the amount and terms of the origination fee or specific information related to bank accounts and transactions. Again, that information is not relevant to the present dispute but, as a sworn declaration attests, could cause competitive harm if it were widely known.

22
23
24
25
26
27
28

Accordingly, Empros is ORDERED to submit unsealed versions of the following with no redactions: (1) its Complaint and (2) its Memorandum of Points and Authorities in Support of its Motion.  Empros is further ORDERED to submit unsealed versions of Complaint Exhibits A–N and R with only the redactions they proposed and I have approved above.  Empros does not need to file unsealed versions of Complaint Exhibits O–Q because they contain only confidential personal or business information not relevant to settling the dispute.  It does not need to file new versions of Complaint Exhibits S–U or Exhibit B to its Motion because the redactions in the

1    publicly available versions of those documents already conform to this Order.

2         The proposed redactions in Complaint Exhibit W are generally impermissible because they

3    relate only to Palantir's identity.  There may, however, be other sealable information in that

4    exhibit.  Therefore, Empros is ORDERED to submit an unredacted, unsealed copy of that exhibit

5    unless it believes it contains information sealable under this Order; if so, Empros shall instead

6    submit a filing within 14 days with specific redactions and the compelling reasons for each.

7         Finally, Empros moves to delete three items from the docket entirely: Exhibit V to its

8    Complaint and the corresponding copies (redacted and unredacted) of that exhibit filed with its

9    motion to seal.  *See* Dkt. No. 6.  It claims that the documents were filed incorrectly, that the

10   redacted versions "contain confidential information that should have been redacted," and that the

11   unredacted version "omits corresponding highlighting indicating the material to be redacted."  *Id.*[8]

12   Empros cannot simply delete the documents in their entirety because it relies on them in its

13   Complaint, *see* Compl. ¶ 66; consequently, I cite the exhibit in my Order on the preliminary

14   injunction.  None of the uses of that exhibit in Empros's Complaint or my Order are sealable.

15   Empros currently redacts Weisbarth's name, which is not permitted under this Order; the other

16   two current redactions are of personal contact details and are, accordingly, proper.  If there is other

17   information in that exhibit that Empros believes can properly be redacted, it shall submit a filing

18   within 14 days identifying specific redactions and the compelling reasons for each.  If there are no

19   further redactions that would comply with this Order, Empros is ORDERED to submit an unsealed

20   version of the document with only the two current redactions I approve.

21        Empros shall submit the unsealed versions of its documents as described within 14 days.

22                                   **CONCLUSION**

23        It is worth underscoring that Empros's motion for a preliminary injunction concerns

24   whether there was an agreement between the parties to arbitrate, and in that context it argued the

25   broader point that no contract at all exists between them.  The record on this motion for

26

27   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28   [8] At Empros's request, the ECF Help Desk blocked those documents from public access pending
     my resolution of this motion.  *See* Dkt. No. 6.  They may remain sealed in this manner until I
     resolve the issue based on Empros's next submission.

United States District Court
Northern District of California

preliminary injunction supports that broader contention, as I discuss above, but the holding in this Order is focused on the narrower question of whether an agreement to arbitrate exists.  None does. Yet because there is no risk of irreparable injury, Empros's motion is DENIED.

      **IT IS SO ORDERED.**

Dated: November 12, 2020



William H. Orrick
United States District Judge