JENNER & BLOCK LLP
TODD C. TORAL (SBN 197706)
ttoral@jenner.com
633 West 5th Street
Los Angeles, CA  90071-2054
Telephone:   (213) 239-5100
Facsimile:    (213) 239-5199

BRIAN J. FISCHER (*pro hac vice*)
bfischer@jenner.com
RÉMI J.D. JAFFRÉ (*pro hac vice*)
rjaffre@jenner.com
919 Third Avenue
New York, NY  10022-3908
Telephone:   (212) 891-1600
Facsimile:    (212) 891-1699

Attorneys for Empros Capital LLC

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| Empros Capital LLC, a California Limited Liability Company,<br><br>                          Plaintiff,<br><br>        v.<br><br>Gary Rosenbach, an individual,<br><br>                          Defendant. | Case No.: 3:20-cv-6788-WHO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

## **<u>TABLE OF CONTENTS</u>**

I.      INTRODUCTION ...........................................................................................................1

II.     FACTUAL BACKGROUND.........................................................................................2

        A.      The Parties ........................................................................................................2

        B.      The Email Exchange Concerning Rosenbach's Potential Investment...............3

        C.      The Draft Documents........................................................................................4

        D.      Empros's Rejection of Rosenbach .....................................................................8

        E.      The Aftermath of Empros's Rejection and Rosenbach's Arbitral Claim .........10

III.    ARGUMENT ..............................................................................................................10

        A.      Empros Is Likely to Succeed on the Merits of Its Claim That Rosenbach Should
                Be Enjoined from Arbitrating His Claim Against Empros................................11

                1.      There Is No Arbitration Agreement Between Empros and Rosenbach. ................11

                2.      Rosenbach's Reliance on the Arbitration Provisions in the Draft
                        Documents Is Unavailing.....................................................................12

                3.      Rosenbach's Reliance on the Parties' Emails and His Returned Wire
                        Transfers is Unavailing. ......................................................................15

        B.      Empros Will Suffer Irreparable Injury if Forced to Arbitrate...........................16

        C.      The Balance of Equities Tips Sharply in Empros's Favor.................................18

        D.      An Injunction Is in the Public Interest. ............................................................18

IV.     CONCLUSION............................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AT & T Mobility LLC v. Bernardi*,
   No. C 11-03992 CRB, 2011 WL 5079549 (N.D. Cal. Oct. 26, 2011)............................................11, 17

*Atlantique Productions, S.A. v. ION Media Networks, Inc.*,
   No. CV128632DMGPLAX, 2014 WL 11820243 (C.D. Cal. Jan. 31, 2014) ..........................12, 13, 14

*Banner Entertainment, Inc. v. Superior Court*,
   72 Cal. Rptr. 2d 598 (Cal. Ct. App. 1998) ..............................................................................13, 14, 15

*Belyea v. GreenSky, Inc.*,
   No. 20-CV-01693-JSC, 2020 WL 3618959 (N.D. Cal. July 2, 2020)..............................................11

*Bestway (USA), Inc. v. Sgromo*,
   No. 17-CV-00205-HSG, 2018 WL 4677681 (N.D. Cal. Sept. 27, 2018)...............................10, 11, 17

*Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*,
   816 F.3d 1208 (9th Cir. 2016) .........................................................................................................12

*Drabek v. AAI Corp.*,
   No. B164233, 2004 WL 1904130 (Cal. Ct. App. Aug. 26, 2004) ......................................................13

*Engineered Data Products, Inc. v. Art Style Printing, Inc.*,
   71 F. Supp. 2d 1073 (D. Colo. 1999)...............................................................................................13

*Jafari v. F.D.I.C.*,
   No. 12CV2982-LAB RBB, 2015 WL 3604443 (S.D. Cal. June 8, 2015)...........................................13

*Johnson v. Oracle Am., Inc.*,
   No. 17-CV-05157-EDL, 2017 WL 11493479 (N.D. Cal. Oct. 4, 2017) .......................................17, 18

*Mohamed v. Uber Techs., Inc.*,
   848 F.3d 1201 (9th Cir. 2016) .........................................................................................................17

*Morgan Stanley & Co., LLC v. Couch*,
   134 F. Supp. 3d 1215 (E.D. Cal. 2015).............................................................................................11

*OppenheimerFunds Distrib., Inc. v. Liska*,
   No. 11-CV-1586 BEN WMC, 2011 WL 5984036 (S.D. Cal. Nov. 28, 2011) ...................................18

*PSM Holding Corp. v. Nat'l Farm Fin. Corp.*,
   339 F. App'x 693 (9th Cir. 2009) .....................................................................................................13

*Rennick v. O.P.T.I.O.N. Care, Inc.*,
   77 F.3d 309 (9th Cir. 1996) .............................................................................................................12

*Schwartz v. Chase*,
    Civ. No. 4274-VCP, 2010 WL 2601608 (Del. Ch. June 29, 2010) ......................................................13

*Spinney v. Downing*,
    41 P. 797 (Cal. 1895) .............................................................................................................................12

*Textile Unlimited, Inc. v. A..BMH & Co.*,
    240 F.3d 781 (9th Cir. 2001) ...........................................................................................................11, 17

*Tiamson v. Equifax, Inc.*,
    No. 19-CV-08430-LHK, 2020 WL 3972582 (N.D. Cal. July 14, 2020) ...............................................11

*World Grp. Sec. v. Ko*,
    No. C035055, 2004 WL 1811145, (N.D. Cal. Feb. 11, 2004) ........................................................17, 18

*Yujin Robot Co. v. Synet Elecs. Inc.*,
    No. CV1406237SJOASX, 2015 WL 12762254 (C.D. Cal. Dec. 22, 2015) ..........................................13

**Court Rules**

Federal Rule of Civil Procedure 65 ...............................................................................................................1

Local Rule 7-10.............................................................................................................................................1

Local Rule 65-1.............................................................................................................................................1

**Other Authorities**

1 Corbin on Contracts § 2.9 (2020) ............................................................................................................16

Empros Capital LLC ("Empros") submits this Memorandum of Points and Authorities in support of its *Ex Parte* Motion under Federal Rule of Civil Procedure 65 and Civil Local Rules 7-10 and 65-1 requesting that the Court issue a temporary restraining order and order to show cause re preliminary injunction staying the arbitration brought by Defendant Gary Rosenbach ("Rosenbach").

## I.      <u>INTRODUCTION</u>

This Motion should be granted for a simple reason: Empros never agreed to arbitrate its disputes with Rosenbach.  If Rosenbach wishes to sue Empros, he must do so in court, not before the American Arbitration Association ("AAA").  The law is clear that arbitration is a matter of contract, and no party can be compelled to submit a dispute to arbitration unless it has contractually agreed to do so.  This is because arbitration requires litigants to forgo important rights and protections, such as jury trials, robust discovery, pre-trial dispositive motions without leave of court, and appeals on a broad range of grounds.

Here, no arbitration agreement exists.  To sidestep this threshold requirement, Rosenbach grounds his arbitration demand against Empros on draft documents that never became final, binding agreements. Draft documents are not contracts.  Indeed, by their own terms, the documents stress clearly and repeatedly that absent full execution by all involved, there will be no contract.  As one illustrative example, the *very first sentence* of one of the documents Rosenbach erroneously claims is an effective contract specifies that it becomes "effective as of the date set forth above the Manager's signature on the Acceptance of Subscription page of this Agreement."  Verified Compl. ("V.C.") Exs. E, I, M at 2.  The Acceptance of Subscription page has no Manager's signature.  *Id.* at 16.  No date is set forth.  *Id.*  The fields are blank. *Id.*

The same can be said about all of the other documents Rosenbach claims are contracts.  Empros never executed them.  On the contrary, Empros informed Rosenbach that it would *not* do so.  Those same documents contain the arbitration clauses on which Rosenbach bases his purported right to arbitrate.  But because the documents never became effective, neither did the arbitration clauses contained in them.

What is more, the proposed agreement Empros and Rosenbach were discussing—but failed to form—is not the sort that is regularly, or even sometimes, concluded informally.  The discussions concerned the private placement of securities.  Rosenbach wanted to invest and become a member in Empros Enterprise Data Technologies Fund II, LLC ("Fund"), a private investment fund sponsored by

Empros.  Such complex transactions between sophisticated parties like Empros and Rosenbach are consummated pursuant to executed documents rich in detail and disclosures, not through emails, draft documents, and assumptions about subjective intent.

The draft documents also stress Empros's ability to reject Rosenbach's investment and membership in the Fund for any reason, or no reason at all.  That is precisely what happened here: Empros decided it did not want Rosenbach's investment and thus rejected it.  And though no reason for such rejection was required, ample reasons existed.  For example, Rosenbach is the cofounder of a hedge fund felled and shuttered by a high-profile insider trading scandal, leading to multiple criminal prosecutions and convictions.  Allowing Rosenbach to invest would expose the Fund to significant reputational risk that it wishes to avoid and is not required to bear.  Further, Rosenbach violated a commitment to keep his prospective investments in the Fund confidential by disclosing them to an Empros competitor.

Against this backdrop, Empros is entitled to preliminary injunctive relief staying Rosenbach's arbitration.  *First*, because there is no arbitration agreement between the parties, Empros has demonstrated a high likelihood of success on the merits of its claim that Rosenbach's claims are not arbitrable.  *Second*, Empros will suffer irreparable harm if forced to expend time and resources defending itself in a forum it never consented to.  *Third*, the balance of equities is sharply in Empros's favor because the hardship to Empros of arbitrating against its will far outweighs any potential harm to Rosenbach from an injunction, as Rosenbach is free to file a complaint against Empros in court.  *Fourth*, a stay of Rosenbach's arbitration would further the public interest in ensuring that parties to disputes are not forced to arbitrate them in the absence of a valid agreement to do so.

## II.      FACTUAL BACKGROUND

### A.      The Parties

Rosenbach is a prominent and sophisticated investor.  In 1997, he cofounded Galleon Group ("Galleon"), formerly one of the largest hedge funds in the world, which at its peak had more than $7 billion in assets under management.  V.C. ¶ 16.  Over the years, Galleon and/or Rosenbach were found to have committed wrongdoing on several occasions, including by participating in a sham tax shelter (resulting in a settlement in which Rosenbach agreed to pay $13 million in taxes, penalties, and interest) and by violating rules governing stock trading (resulting in a $2 million settlement payment by Galleon).

*Id.*  Rosenbach remained in the CEO role at Galleon until March 2009, mere months before Galleon was shuttered in the midst of a widely reported insider trading investigation that resulted in criminal convictions for around two dozen people.  V.C. ¶ 17.  This included Rosenbach's Galleon cofounder, Raj Rajaratnam, who was found guilty by a jury on 14 counts of securities fraud and conspiracy and sentenced to 11 years in prison.  *Id.*  After the collapse of Galleon, Rosenbach launched a new investment fund and has been its managing partner ever since.  *Id.*.

Empros is a venture capital firm founded by Alex Fishman in 2017.  V.C. ¶ 18.  Empros specializes in partnering with investors and technology companies.  It is the "sponsor" of the Fund, a private investment fund that permits its investors to gain exposure to shares of Palantir, a highly-valued, privately-traded technology firm.  *Id.*  Shares of the Fund may be bought only through Empros, which in its role as sponsor performs a "gatekeeper" function for the Fund.  *Id.*  Crucially, before any prospective investor is accepted, those prospective investors (who become members of the Fund) must be approved formally in writing by Empros and the Fund's manager, Assure Fund Management II, LLC ("Manager").  *Id.*  Before the events giving rise to this dispute, neither Empros nor Fishman had any relationship with Rosenbach.  V.C. ¶ 19.

**B.    The Email Exchange Concerning Rosenbach's Potential Investment**

On Tuesday, June 9, 2020, at 5:42 p.m.,[1] Rosenbach had his broker-dealer, Matt Weisbarth, email Fishman about the possibility of investing in the Fund, without identifying Rosenbach as the prospective investor.  V.C. ¶ 20.  That evening and again the following morning the parties exchanged a few emails in which Weisbarth confirmed the broad financial terms of Rosenbach's desired investment and provided some additional information requested by Fishman.  V.C. ¶¶ 20–21.  At all times, Fishman made it clear that fully executed transaction documents would be necessary before the investment could be consummated—as would have been obvious to someone with Rosenbach's depth of experience.  In one email, for example, Fishman requested the name of the investor's "entity" and "his email address" so that Empros could "send him a link with closing details . . . and wiring instructions."  V.C. ¶ 21.  In a subsequent email, Fishman explained that an Empros employee would "send out docs after we have info," and stated, "We need to get this funded by Friday."  *Id.*

---

[1] All times in this Memorandum are Pacific Daylight Time.

Weisbarth then identified Rosenbach as the investor, and on Wednesday, June 10, 2020, at 7:36 p.m. (roughly 24 hours after Weisbarth's initial email), an Empros employee emailed Rosenbach links to electronic signature packages for each of the three entities through which Rosenbach wanted to invest (hereinafter, the "Rosenbach Entities").  V.C. ¶ 22.  This email ("June 10 Email") explained that each signature package included four draft documents ("Draft Documents"): (1) a "Private Placement Memorandum"; (2) an "Operating Agreement" that "[e]xplains the terms of the [F]und"; (3) a "Subscription Agreement" that "governs the individual subscription to the [F]und"; and (4) a "Certificate of Designation."  V.C. ¶ 23.  The June 10 Email also provided wire instructions and stated: "<u>Its [sic] critical that we receive your wire by Monday June 15th</u>, so please be sure to initiate it by Friday June 12th."  *Id.* (emphasis in original).

The June 10 Email also stressed the necessity of fully executed transaction documents before any agreement could be formed.  It requested that Rosenbach click on the links "to execute on behalf of each entity."  *Id.*  It also stated that the Operating Agreement "will be executed, by the Sponsor [and] the Manager."  *Id.*  It explained that the Subscription Agreement "covers some of our KYC/AML [Know Your Client/Anti-Money Laundering] required documentation," necessarily implying that Empros and the Fund could accept Rosenbach's investment only after undertaking legally required due diligence.  *Id.*

Finally, the June 10 Email included a link to a disclaimer stating:

This material . . . is not intended to be, nor shall it be construed as . . . an offer, or the solicitation of any offer, to buy or sell any securities . . . .  Any such offer or solicitation may only be made by means of delivery of an approved confidential offering memorandum.  Any other information provided herein is for informational purposes only . . . .  V.C. ¶ 24.

In other words, the June 10 Email itself was not a legal offer.  It was informational.  Any ensuing contractual relationship would arise only from formalizing the various Draft Documents.

### C.   The Draft Documents

The Draft Documents repeatedly reinforced what was already clear from the parties' email exchange: there would be no agreement unless the Draft Documents and other required paperwork were fully executed, and Empros and the Fund retained the right to reject Rosenbach's request in their sole

discretion.   The relevant provisions concerning the signature requirement and the right to reject held by Empros and the Fund are set out in the two tables below.

**Table 1: Provisions specifying necessity of full execution (emphases added)**

| Provision | Citation |
|---|---|
| "The Manager (with the prior approval of the Sponsor) may admit any Person as a Member ***upon signing a counterpart of this Agreement*** . . . .  Such admission shall be effective ***when the Manager enters the name of such Person on the Interest Register***." | Operating Agreement § 4.1, V.C. Exs. D, H, L at 9. |
| "This Subscription Agreement is . . . effective as of the date set forth ***above the Manager's signature on the Acceptance of Subscription page of this Agreement***." | Subscription Agreement, V.C. Exs. E, I, M at 2. |
| "The Subscriber shall be admitted as a Member in the Fund ("Member") ***at the time this Subscription is accepted and executed by the Manager*** . . . ." | Subscription Agreement § 1(b), V.C. Exs. E, I, M at 2. |
| "This Subscription shall be deemed to be accepted by the Manager and this Agreement shall be binding against the Manager ***only upon execution and delivery to the Subscriber of the Acceptance of Subscription attached hereto***.  At the Closing, the Manager will execute, subject to the approval of the Sponsor, the Acceptance of Subscription and deliver notice of such Closing to the Subscriber within a reasonable time after such Closing.  ***Upon such acceptance***, the Subscriber shall be issued the Fund Interest for which it has subscribed." | Subscription Agreement § 1(c), V.C. Exs. E, I, M at 2. |

| Provision | Citation |
|---|---|
| "***By signing below***, the Fund hereby accepts Subscriber's subscription for Interests in the Fund . . . ." | Subscription Agreement, "Acceptance of Subscription" page, V.C. Exs. E, I, M at 16. |

**Table 2: Provisions specifying Fund's right to reject (emphases added)**

| Provision | Citation |
|---|---|
| "All Total Subscription Amounts will be held in an Account until the earlier of: (i) the acceptance by the Sponsor of the Subscriber's Subscription Documents and satisfaction of the conditions of the Closing . . . or (ii) ***the rejection by the Sponsor of the subscription or the termination of this Offering.***" | Private Placement Memorandum Art. I, "Investment Procedure," V.C. Exs. C, G, K at 4. |
| "The Sponsor reserves the right to reject any subscription, in whole or in part." | Private Placement Memorandum, Art. I, "Acceptance/Rejection of Subscriptions," V.C. Exs. C, G, K at 4. |
| "Investors that do not have a substantive and preexisting relationship with the Sponsor or the Manager or any of their respective affiliates ***must not consider themselves to be offerees of the Interests***." | Private Placement Memorandum Art. VI, "Eligible Investors and Sustainability Standards," V.C. Exs. C, G, K at 14. |

| Provision | Citation |
|---|---|
| "The Sponsor reserves the right, *in its exclusive discretion*, to reject any Subscription Agreement *for any reason*, regardless of whether a prospective investor meets the suitability standards contained herein." | Private Placement Memorandum Art. VI, "Reliance on Subscriber Information," V.C. Exs. C, G, K at 15. |
| "The Sponsor may accept or reject any subscription in whole or in part, *in its sole discretion, for any reason whatsoever*, and to withdraw the Offering at any time." | Private Placement Memorandum Art. XII, V.C. Exs. C, G, K at 34. |
| "The Manager (with the prior approval of the Sponsor) *shall have the authority to reject any subscription for an Interest in whole or in part*." | Operating Agreement § 4.1, V.C. Exs. D, H, L at 9. |
| "This Subscription, *when and if accepted by the Manager*, as manager of the Fund, *subject to the approval of the Sponsor*, will constitute a commitment to contribute to the Fund that portion of the Subscription Amount accepted by the Manager . . . ." | Subscription Agreement § 1(b), V.C. Exs. E, I, M at 2. |
| "The Manager, on behalf of the Fund, subject to the approval of the Sponsor, *may accept or reject this Subscription, in whole or in part, in its sole discretion, subject to the approval of the Sponsor*." | Subscription Agreement § 1(c), V.C. Exs. E, I, M at 2. |

| Provision | Citation |
|---|---|
| "The Fund has ***the unrestricted right to condition its acceptance of the Subscriber's subscription***, in whole or in part, upon the receipt by the Fund of any additional instruments (including any designations, representations, warranties, covenants), documentation and information requested by the Fund in its sole discretion . . . ." | Subscription Agreement § 1(d), V.C. Exs. E, I, M at 2. |

Several other provisions of the Draft Documents are also relevant.  First, the Private Placement Memorandum expressly contemplates that funds wired by a prospective investor whose application is rejected would "be returned without interest."  Private Placement Memorandum Art. XII, V.C. Exs. C, G, K at 34.  Second, each of the Operating Agreement and the Subscription Agreement include a merger clause stating that the agreement supersedes all prior written or oral agreements or understandings of the parties relating to the subject-matter of the agreement.  Operating Agreement § 14.16, V.C. Exs. D, H, L at 33; Subscription Agreement § 18, V.C. Exs. E, I, M at 12.  Finally, the Operating Agreement and the Subscription Agreement contain dispute resolution provisions that would kick in to govern the parties' disputes once those documents became effective and binding (which, of course, they never did).  Those provisions would have required the parties to resolve certain types of disputes through arbitration before the AAA.  Operating Agreement § 14.6, V.C. Exs. D, H, L at  32; Subscription Agreement § 7, V.C. Exs. E, I, M at 9.  The Operating Agreement would further have required that those disputes be resolved by a three-person panel of arbitrators.  Operating Agreement § 14.6, V.C. Exs. D, H, L at 32.

**D.      Empros's Rejection of Rosenbach**

On Thursday, June 11, 2020, Rosenbach returned completed electronic signature packages for each of the Rosenbach Entities, and on Friday, June 12, 2020, he wired the money for his prospective investments through two of the Rosenbach Entities.  V.C. ¶ 57.  Rosenbach, however, did not meet the deadline to wire the money for the prospective investment through the third Rosenbach Entity.  *Id.*

After that, events unfolded exactly as the Draft Documents envisioned they might: Empros rejected Rosenbach's investment.  V.C. ¶ 62.  Empros had complete discretion to do so and did not need a reason. Nevertheless, its decision was not arbitrary.  Empros, which had only learned Rosenbach's identity on Wednesday, June 9, 2020, realized that he was the same Rosenbach who had cofounded Galleon, the hedge fund at the center of one of the largest insider trading scandals in American history.  V.C. ¶ 58.  Any sponsor in Empros's shoes would have been justifiably wary of a potential investor with Rosenbach's reputation.

Moreover, over the weekend, Empros learned that Rosenbach had violated Empros's expectation that Rosenbach would keep his possible investment confidential by divulging it, as well as the pricing the parties had discussed, to one of Empros's most significant competitors.  V.C. ¶ 59.  Any seasoned investor like Rosenbach would have known that this information was to be kept confidential; but in any event Empros clearly communicated its expectation of confidentiality to Rosenbach by bolding and underlining the word "confidential" in the June 10 Email and through confidentiality provisions in the Private Placement Memorandum and the Subscription Agreement.  *See* Private Placement Memorandum, "General Notices," V.C. Exs. C, G, K at 1; Subscription Agreement § 8, V.C. Exs. E, I, M at 10.  The disclosure indicated, at best, that Rosenbach's team could not be trusted to handle confidential information appropriately, and Empros was justifiably hesitant to commence a relationship with Rosenbach in which he would receive confidential information about Empros and the Fund on a regular basis.

After the disclosure to Empros's competitor, Rosenbach and Weisbarth contacted Empros in an attempt to salvage the deal.  They expressed hope that the deal could still move forward—thus acknowledging that, at that point, no binding agreement had been reached.  V.C. ¶¶ 60–61.  Nevertheless, on Monday, June 15, 2020, as contemplated by the Draft Documents, Empros informed Rosenbach of its decision to reject his investment and instructed Empros's bank to return the two wires it had received.  V.C. ¶¶ 62–63.  The bank processed that request the next day.  V.C. ¶ 63.  At no point did the Fund execute the "Acceptance of Subscription" page in the Subscription Agreement.  Nor did the Fund, Empros, or the Manager sign the Operating Agreement.  V.C. ¶ 68.  The Draft Documents never became contracts.

**E.      The Aftermath of Empros's Rejection and Rosenbach's Arbitral Claim**

For several weeks after the rejection, Rosenbach continued to press aggressively for membership in the Fund, manifestly unable to accept Empros's continued refusal to admit him on the broad financial terms the parties had discussed over email.  V.C. ¶ 64.  As Rosenbach grew increasingly frustrated, he eventually texted Fishman that Fishman had made a "[b]ig mistake" and that "in [his] entire career" Rosenbach had "never faced anything or anyone like" Fishman, and followed this up with another text stating that Fishman had "f**ked with the wrong marine."  V.C. ¶ 65.

On September 8, 2020, Rosenbach filed a statement of claim with the AAA against Empros ("Statement of Claim" in the "AAA Arbitration").  Rosenbach asserts in the Statement of Claim that he formed a contract with Empros entitling Rosenbach to membership in the Fund.  Specifically, Rosenbach alleges that Weisbarth's email proposing financial terms for Rosenbach's investment was a contractual offer, and that Empros accepted the offer by sending the June 10 Email—even though that email and the accompanying documents stated expressly that the deal would not be complete until all necessary documents were fully executed, and that Empros and the Fund retained complete discretion to reject Rosenbach for any reason.  Rosenbach asserts that Empros breached that purported contract, and requests specific performance of the purported contract as well as Rosenbach's costs and attorney's fees for the arbitration.  Rosenbach bases his supposed right to arbitrate on clauses in the Draft Documents that require that certain disputes between the parties be arbitrated before the AAA—even though the Draft Documents never became contracts.  *See* Operating Agreement § 14.6, V.C. Exs. D, H, L at 32; Subscription Agreement § 7, V.C. Exs. E, I, M at 9.

On September 15, 2020, the AAA formally notified Empros of the arbitration.  V.C. ¶ 67.

On September 29, 2020, Empros filed a notice with the AAA objecting to and denying its jurisdiction over the parties' dispute.  *See* Jaffré Decl. Ex. B.

## III.      **ARGUMENT**

To obtain a temporary restraining order or a preliminary injunction, a party "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Bestway (USA), Inc. v. Sgromo*, No. 17-CV-00205-HSG, 2018 WL 4677681, at *1 (N.D. Cal.

10

Sept. 27, 2018) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008)).  A party may carry this burden by showing "a combination of probable success on the merits and the possibility of irreparable injury."  *Textile Unlimited, Inc. v. A..BMH & Co.*, 240 F.3d 781, 786 (9th Cir. 2001).  Moreover, district courts may "prevent one party from foisting upon the other an arbitration process to which the first party had no contractual right.'"  *Morgan Stanley & Co., LLC v. Couch*, 134 F. Supp. 3d 1215, 1234 (E.D. Cal. 2015) (quoting *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011)) (granting preliminary injunction enjoining arbitration), *aff'd*, 659 F. App'x 402 (9th Cir. 2016).

All four elements are satisfied here, and Empros is entitled to emergency relief staying the AAA Arbitration.

**A.     Empros Is Likely to Succeed on the Merits of Its Claim That Rosenbach Should Be Enjoined from Arbitrating His Claim Against Empros.**

**1.     There Is No Arbitration Agreement Between Empros and Rosenbach.**

Empros is likely to succeed on the merits of its request to enjoin Rosenbach from proceeding with his arbitration because there is no arbitration agreement between Empros and Rosenbach.  "[T]he Supreme Court has repeatedly emphasized that 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"  *AT & T Mobility LLC v. Bernardi*, No. C 11-03992 CRB, 2011 WL 5079549, at *3 (N.D. Cal. Oct. 26, 2011) (quoting *AT & T Techs. Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)) (granting preliminary injunction enjoining arbitration).

"[A]n essential element of any contract is the consent of the parties, or mutual assent."  *Belyea v. GreenSky, Inc.*, No. 20-CV-01693-JSC, 2020 WL 3618959, at *6 (N.D. Cal. July 2, 2020) (quoting *Donovan v. RRL Corp.*, 26 Cal.4th 261, 270 (2001)).  "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe."  *Tiamson v. Equifax, Inc.*, No. 19-CV-08430-LHK, 2020 WL 3972582, at *4 (N.D. Cal. July 14, 2020) (quoting *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998)).

Here, Empros never agreed to submit its disputes with Rosenbach to arbitration.  Indeed, there was never any agreement between the parties at all.  Empros and Rosenbach had no preexisting relationship,

and the sum of their relevant interactions consisted of a handful of email and telephonic communications over the course of a few business days that never ripened into a deal.  The parties are thus essentially strangers, and like most strangers, they are not required to resolve their disputes through arbitration. Because there is no arbitration agreement, Empros is likely to succeed on the merits of its claim.

2.  **Rosenbach's Reliance on the Arbitration Provisions in the Draft Documents Is Unavailing.**

In the absence of an actual arbitration agreement, Rosenbach bases his putative right to arbitrate on arbitration provisions in the Draft Documents that never went into effect.  But even when a document contains an arbitration provision, "the threshold issue is whether that document constituted a binding agreement at all.  If it did not constitute such an agreement, it follows that the arbitration provision is not enforceable."  *Casa del Caffe Vergnano S.P.A. v. ItalFlavors, LLC*, 816 F.3d 1208, 1211 (9th Cir. 2016) (reversing order compelling arbitration).  Here, the Draft Documents never became binding, and Plaintiffs never assented to the arbitration clauses in those documents.  Rosenbach has no right to force Plaintiffs to arbitrate under documents that never became contracts.

Though Rosenbach executed the Draft Documents, Empros did not, nor did any other party.  Where the parties intend to be bound by a potential contract only if it is fully executed, it cannot be enforced against a party that has not signed it.  As the Supreme Court of California emphasized over a century ago, "when it is a part of the understanding between the parties that the terms of their compact are to be reduced to writing, and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon, or it does not become a binding obligation upon either."  *Spinney v. Downing*, 41 P. 797, 798 (Cal. 1895). More recently, the Ninth Circuit Court of Appeals made the same point: "If there is a manifest intention that the formal agreement is not to be complete until reduced to a formal writing to be executed, there is no binding contract until this is done."  *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) (quotation marks and citation omitted).

Applying this well-established rule, the court in *Atlantique Productions, S.A. v. ION Media Networks, Inc.*, No. CV128632DMGPLAX, 2014 WL 11820243 (C.D. Cal. Jan. 31, 2014), *aff'd*, 644 F. App'x 800 (9th Cir. 2016), found that the parties were not bound by an unsigned term sheet because the defendant had communicated to the plaintiff that their agreement would become binding only after both

parties signed and that the defendant needed to obtain the requisite internal approvals, and the plaintiff

agreed to this signing protocol.  *Id.* at *5–6.

Several other recent cases reinforce this fundamental point of contract law.  *See, e.g., PSM Holding Corp. v. Nat'l Farm Fin. Corp.*, 339 F. App'x 693, 694 (9th Cir. 2009) ("The provision at issue required that all parties sign the agreement before it became binding. Several signature lines were left blank. We therefore hold that the parties did not form a valid contract."); *Yujin Robot Co. v. Synet Elecs. Inc.*, No. CV1406237SJOASX, 2015 WL 12762254, at *10–11 (C.D. Cal. Dec. 22, 2015) (unsigned draft agreement stating that it would become binding upon signature by both parties never became binding contract); *Jafari v. F.D.I.C.*, No. 12CV2982-LAB RBB, 2015 WL 3604443, at *6 (S.D. Cal. June 8, 2015) (letter stating that it would become binding upon signature by all parties never became binding contract where one party did not sign); *Drabek v. AAI Corp.*, No. B164233, 2004 WL 1904130, at *7 (Cal. Ct. App. Aug. 26, 2004) (stating that it is "illogical" that a party could have entered into an enforceable contract without signing the document memorializing its terms, where the document stated that it would "not take effect until signed by both parties").[2]

This rule has been used to prevent parties from hailing into arbitration those who never executed draft contracts containing arbitration clauses.  In *Banner Entertainment, Inc. v. Superior Court*, 72 Cal. Rptr. 2d 598 (Cal. Ct. App. 1998), the court vacated an order compelling the parties to arbitrate their dispute, finding that the draft agreements at issue, which the party resisting arbitration never signed, never became effective because they stated expressly that they would become binding "when signed by the parties hereto."  *Id.* at 604.  The court further observed that there was no evidence that the parties had orally or otherwise discussed arbitration.  *Id.* at 605.  Simply applying the basic principal of contract law to a

---

[2] On this basic point, the law of Colorado (Rosenbach's place of residence) and the law of Delaware (which would have become operative had the Draft Documents matured into actual contracts) are, unsurprisingly, in accord.  In *Engineered Data Products, Inc. v. Art Style Printing, Inc.*, 71 F. Supp. 2d 1073 (D. Colo. 1999), the court held that the parties were not bound by a letter setting out the broad terms of a settlement agreement, even though both parties had signed the letter, because the parties had intended that their settlement would later be memorialized in a more formal document.  *Id.* at 1080.  That intent was evident from their prior correspondence and from the letter itself, both of which referenced a "formal agreement" to be drafted, and from the fact that one of the parties then in fact drafted a detailed settlement agreement.  *Id.* at 1078–79.  And in *Schwartz v. Chase*, Civ. No. 4274-VCP, 2010 WL 2601608 (Del. Ch. June 29, 2010), the court held that a settlement agreement never became binding because, *inter alia*, the party that did not sign it had clearly expressed that he would not be bound absent full execution by all parties.  *Id.* at *8–10.

species of contract law—arbitration agreements—the court explained: "When it is clear, both from a provision that the proposed written contract would become operative *only* when signed by the parties as well as from any other evidence presented by the parties that both parties contemplated that acceptance of the contract's terms would be signified by signing it, the failure to sign the agreement means no binding contract was created.  This is so even though the party later sought to be bound by the agreement indicated a willingness to sign the agreement."  *Id.* at 603 (emphasis in original) (internal and concluding citations omitted).

Here, the parties plainly did not intend the Draft Documents—or the arbitration clauses they contained—to become operative except upon execution by all required signatories.  Empros communicated that intent to Rosenbach—repeatedly—through the June 10 Email and the language of the Draft Documents.  And like the plaintiff in *Atlantique Productions*, Rosenbach assented to this signing protocol by completing the electronic signature packages and returning them to Empros.

With respect to the Operating Agreement, the June 10 Email stated that it would need to be "executed, by the Sponsor [and] the Manager."  V.C. ¶ 23.  Consistent with this, the Operating Agreement contains signature pages for the Fund, the Manager, and Empros, and provides that the Manager admitted new members to the Fund "upon signing a counterpart of this Agreement."  V.C. ¶ 43.

As for the Subscription Agreement, it could not be clearer that it would become operative only upon the Manager's signing the "Acceptance of Subscription" page.  The signature line on that page states: "By signing below, the Fund hereby accepts Subscriber's subscription for Interests in the Fund . . . ."  V.C. ¶ 48.  The very first paragraph of the Subscription Agreement provides that the Subscription Agreement will become "effective as of the date set forth above the Manager's signature on the Acceptance of Subscription page of this Agreement."  V.C. ¶ 44.  And other sections of the Subscription Agreement further provide that potential investors will be admitted as members in the Fund only "at the time this Subscription is accepted and executed by the Manager," and that the Subscription Agreement will become "binding against the Manager *only* upon execution and delivery to the Subscriber of the Acceptance of Subscription attached hereto."  V.C. ¶ 46 (emphasis added); *see also* Table 1, *supra* at pp. 5–6 (cataloguing all instances of the signature requirement in the Draft Documents).  That execution and delivery never happened.

Execution by the Fund and Manager as a precondition to contract formation was no mere ceremonial flourish.  Rather, it safeguarded Empros's right to reject Rosenbach's investment and membership in the Fund.  That right is set out throughout the Draft Documents.  For example, the draft Subscription Agreement specifies that "[t]he Manager, on behalf of the Fund, subject to the approval of the Sponsor [Empros], *may accept or reject [Rosenbach's] Subscription, in whole or in part, in its sole discretion, subject to the approval of the Sponsor [Empros]*."  Subscription Agreement § 1(c), V.C. Exs. E, I, M at 2 (emphasis added).  Likewise, the draft Operating Agreement provides that "[t]he Manager (with the prior approval of the Sponsor [Empros]) shall have the authority to reject any subscription for an Interest in whole or in part."  Operating Agreement § 4.1, V.C. Exs. D, H, L at 9; *see also* Table 2, *supra* at pp. 6–8 (cataloguing all instances of Empros's right to reject potential investors).  That right to reject ensures that the Fund and its Manager and Sponsor have the ability to scrutinize prospective investors' applications, some of which may present information that requires rejection, or that counsels strongly in rejection's favor, such as in Rosenbach's case given the reputational risk he carried and his mishandling of highly sensitive Empros information.

Thus, the Operating Agreement and Subscription Agreement, by their own terms, could not become binding on Empros or the Fund until they signed them, and carefully preserved Empros's and the Fund's discretion to withhold those signatures for any reason.  As the documents contemplated, Empros and the Fund did withhold those signatures.  Accordingly, the Operating Agreement and Subscription Agreement, and their arbitration provisions, are ineffective.  Rosenbach cannot simultaneously seek to enforce those arbitration provisions while ignoring other provisions in the same documents expressly stating that they would not become effective unless fully executed.

**3.      Rosenbach's Reliance on the Parties' Emails and His Returned Wire Transfers is Unavailing.**

To the extent Rosenbach grounds his supposed right to arbitrate on the parties' dealings in the days leading up to and following Empros's rejection of Rosenbach, those arguments are also unavailing.  Fundamentally, like the parties in *Banner Entertainment*, Empros and Rosenbach never discussed arbitration at any time.  There was no reference to arbitration anywhere in the parties' dealings outside the arbitration clauses in the never-executed Operating Agreement and Subscription Agreement.

In any event, Rosenbach cannot argue that the parties' email exchange created a binding agreement. Empros's emails leading up to the June 10 Email repeatedly refer to forthcoming documentation that would memorialize the terms of Rosenbach's desired investment.  Similarly, the June 10 Email itself plainly expressed that the parties would need to fully execute the attached documentation, and contained a disclaimer expressly stating that the email was "not intended to be, nor shall it be construed as . . . an offer, or the solicitation of any offer, to buy or sell any securities" and was "for informational purposes only." V.C. ¶ 24.

The broader context confirms that the parties could not have entered into a binding agreement based on a handful of emails.  The transaction contemplated by Rosenbach was the purchase of shares in a private investment fund, from counterparties with whom he had no preexisting relationship.  A sophisticated and experienced investor like Rosenbach surely knows that this type of transaction is not concluded informally, but is customarily memorialized in detailed documents with signatures to evidence the parties' assent to the documents' terms.  *See* 1 Corbin on Contracts § 2.9 (2020) ("The greater the complexity and importance of the transaction, the more likely it is that the informal communications are intended to be preliminary only.").  Nothing in the parties' negotiating history could reasonably have given Rosenbach the impression that these stringent requirements did not apply in this case.

Finally, no binding agreement was created by Rosenbach's wiring of funds on Friday, June 12, 2020.  As an initial matter, Rosenbach never wired sufficient funds to complete his desired investment because he never sent a wire for the third Rosenbach Entity.  V.C. ¶ 58.  Setting this failing aside, the Draft Documents expressly state that funds provided by prospective investors who are rejected would be returned without interest.  Private Placement Memorandum Art. XII, V.C. Exs. C, G, K at 34.  Consistent with those provisions, Empros instructed its bank to return Rosenbach's funds on Monday, June 15—the very next business day—and Empros's bank processed the request the following day.  V.C. ¶ 64.

In sum, there simply is no binding agreement between Empros and Rosenbach—and certainly no binding arbitration agreement.  Accordingly, Empros is likely to succeed on the merits of its claim.

**B.    Empros Will Suffer Irreparable Injury if Forced to Arbitrate.**

Empros faces irreparable injury in the absence of an injunction.  Without the Court's intervention, Empros will be required to arbitrate claims it did not agree to arbitrate.  Empros will have to expend

significant resources defending against Rosenbach's claims in that forum, including attorneys' fees, arbitrator fees (which will be tripled if Rosenbach seeks to enforce the Operating Agreement's three-arbitrator requirement), and the time spent by Empros's officers and employees in assisting with the arbitration.

As numerous decisions have recognized, this harm "constitutes an irreparable harm for which there is no adequate remedy at law." *Johnson v. Oracle Am., Inc.*, No. 17-CV-05157-EDL, 2017 WL 11493479, at *2 (N.D. Cal. Oct. 4, 2017); *accord Textile Unlimited*, 240 F.3d at 786 (affirming finding that party would suffer irreparable harm absent a stay of arbitration); *Bestway (USA)*, 2018 WL 4677681, at *1 ("Bestway would be likely to suffer irreparable injury absent a preliminary injunction, in the form of inconsistent or contradictory rulings from a JAMS arbitrator and the expense of irrecoverable resources."); *AT & T Mobility*, 2011 WL 5079549, at *10 (explaining that "being forced to defend an improper arbitration demand requires expending human and monetary capital for which there is no adequate remedy at law"); *World Grp. Sec. v. Ko*, No. C035055 MJJ(EDL), 2004 WL 1811145, at *7 (N.D. Cal. Feb. 11, 2004).

Challenging the AAA's jurisdiction within the AAA Arbitration is not a viable alternative to a stay from this Court because it would require Empros to submit to the AAA's authority when it never agreed to do so in the first place.  It is well established that "whether the court or the arbitrator decides arbitrability is an issue for judicial determination unless the parties *clearly and unmistakably provide otherwise*." *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (internal quotation marks omitted). Here, even if the Draft Documents had become binding agreements, the text of the arbitration clauses lacked any provision delegating to an arbitrator disputes over arbitrability.

Nor is forcing Empros to wait until the arbitration is complete to challenge the AAA's authority an alternative to a stay from this Court.  When that challenge succeeds, Rosenbach will surely sue Empros in court over the same supposed breaches of contract, meaning that Empros will have to defend itself against Rosenbach's claims twice from scratch.

Accordingly, Empros will suffer irreparable harm if forced to arbitrate.

**C.     The Balance of Equities Tips Sharply in Empros's Favor.**

The balance of equities also points in Empros's favor.  The burden on Empros if it is denied an injunction will be substantial.  Empros faces significant hardship from being forced to engage in an arbitration to which it did not agree.  *See World Grp. Sec.*, 2004 WL 1811145, at *8 (holding that balance of equities tipped in favor of plaintiff seeking stay of arbitration and recognizing hardship from plaintiff being "compelled to arbitrate in the absence of a clear agreement to do so"); *Johnson*, 2017 WL 11493479, at *2 (holding that balance of equities "tips in favor of an injunction because Defendant would be forced to spend time and money arbitrating class claims absent its agreement to do so").

By contrast, Rosenbach faces no equivalent hardship if the AAA Arbitration is stayed.  A preliminary injunction would simply preserve the status quo while the Court makes a final determination on the issue of arbitrability.  *See OppenheimerFunds Distrib., Inc. v. Liska*, No. 11-CV-1586 BEN WMC, 2011 WL 5984036, at *5 (S.D. Cal. Nov. 28, 2011).  At most, that delay would cause Rosenbach only "economic harm, a harm which can be adequately compensated by an award of pre-judgment interest." *Johnson*, 2017 WL 11493479, at *2.  But in this case it is doubtful that Rosenbach will even suffer any economic harm at all, because the remedy Rosenbach seeks in the AAA Arbitration—specific performance entitling him to membership in the Fund at a fixed price—will not decrease in value with the passage of time.

Because the substantial burden on Empros in the absence of an injunction far outweighs any conceivable burden on Rosenbach from the injunction, the balance of equities favors an injunction.

**D.     An Injunction Is in the Public Interest.**

Finally, the public interest also favors an injunction.  Staying the AAA Arbitration would further the public interest in ensuring arbitration is not compelled without agreement.  *See Johnson*, 2017 WL 11493479, at *2 ("Finally, the public interest favors a preliminary injunction when the parties 'have not explicitly agreed to arbitration.'" (quoting *Ingram Micro Inc. v. Signeo Int'l, Ltd.*, No. SACV 13-1934-DOC ANX, 2014 WL 3721197, at *5 (C.D. Cal. July 22, 2014))); *World Grp. Sec.*, 2004 WL 1811145, at *8 ("To the extent that ensuring that arbitration is not compelled without an agreement to do so reflects a public policy, then the public interest weighs in favor of issuing the injunction.").  By contrast, forcing the

parties to arbitrate would frustrate the public interest by contravening the basic principle that arbitration depends on the consent of the parties.

### IV.   CONCLUSION

The issue before the Court is simple.  Rosenbach has no right to pursue the AAA Arbitration because there is no arbitration agreement between the parties.  Rosenbach and Empros communicated for a few days about a potential transaction that fell through.  For all intents and purposes, they remain strangers to each other, and like most strangers, they have no arbitration agreement.  Without a stay, Empros will be irreparably harmed by being forced to arbitrate a dispute when it did not agree to do so.  The relief requested in the Motion flows straightforwardly from these principles.  Empros respectfully requests that the Court grant Empros's Motion for a Temporary Restraining Order and Order to Show Cause re Preliminary Injunction staying the AAA Arbitration.

Dated:  September 30, 2020

JENNER & BLOCK LLP

By: _____
TODD C. TORAL

ttoral@jenner.com
633 West 5th Street
Los Angeles, CA  90071-2054

BRIAN J. FISCHER (*pro hac vice*)
bfischer@jenner.com
RÉMI J.D. JAFFRÉ (*pro hac vice*)
rjaffre@jenner.com
919 Third Avenue
New York, NY  10022-3908

Attorneys for Empros Capital LLC